[No. A028572. First Dist., Div. Two. Nov. 21, 1986.]

MARILYN D. COLLINS et al., Plaintiffs and Appellants, v.
SAFEWAY STORES, INC., et al., Defendants and Respondents.

64

---

**COUNSEL**

Hoberg, Finger, Brown, Cox & Molligan, Stephen T. Cox, David W. Moyer, Barbara A. Zuras and Dennis C. Birkhimer for Plaintiffs and Appellants.

Carr & Mussman, Timothy E. Carr, Lenell Topol, Edward J. McFetridge, Curtis R. Ponzi, St. Clair, Zappettini, McFetridge & Griffin, Wood, Chettle, Henrioulle & Maddux and Gary N. Wood for Defendants and Respondents.

## OPINION

**BENSON, J.**—This action is brought by four named plaintiffs on behalf of themselves and other residents of California who, during the period November 1979 through March 1980, had purchased eggs produced by the defendant Hayre's Egg Producers and sold by defendant Safeway Stores, Inc. The named plaintiffs moved to have their proposed class certified. This appeal is from the trial court's order denying their motion to certify the class. We affirm the trial court's decision, and in doing so we hold: (1) that the trial court did not utilize improper criteria in determining the appropriateness of class certification; (2) that the action is without merit; (3) that the proffered economic damage class was not ascertainable; (4) that the device of "fluid recovery" cannot serve as a substitute for proof of the necessary element of damage where there is no probability of any individual class members coming forward and proving their particular damages, and where no public policy is served by utilization of a "fluid recovery" means of distribution.

### Factual and Procedural Background

Hayre's is a producer of eggs located in Lathrop, California. During the period November 1979 through March 1980, Hayre's sold Safeway approximately 1.5 million dozen eggs which were then sold by Safeway under the Lucerne brand to California consumers.

In October 1979, Hayre's removed old laying chickens from three of its ten units which supplied eggs to Safeway. Before restocking with new, young chickens, the three units were cleaned by an employee. The employee, without asking or informing anyone at Hayre's, used an insect spray containing chlordane to rid the units of spiders, mites and other pests. Following the cleanup, the units were restocked and egg production within the three units resumed.

In March 1980, the Food and Drug Administration (FDA), in a routine inspection, discovered traces of chlordane in the eggs and in the chickens in these three units. The eggs produced in these units constituted approximately 20 percent of the eggs sold by Hayre's to Safeway.

Hayre's system of production kept the eggs from different units separate only until the eggs reach the grading and packing area. Once the eggs are processed and are ready to be packaged, they are commingled and can no longer be identified by the unit in which they were produced.

In Safeway stores, eggs produced by Hayre's were stocked with eggs produced by other egg suppliers. During the relevant time period, 20 percent to 30 percent of the eggs sold by Safeway under the Lucerne label were produced by Hayre's. The Lucerne cartons containing Hayre's eggs were stamped with an "M" which identified them as coming from that supplier.

Upon discovering the chlordane contamination, the FDA notified Hayre's which in turn immediately notified its customers, including Safeway.[1] Since there was no way to identify which eggs came from the three Hayre's units sprayed with chlordane, it was impossible for Safeway to ascertain which eggs produced by Hayre's were contaminated. Safeway, therefore, ordered all Hayre's eggs pulled from the shelves. Safeway cooperated with the media in warning the public not to use eggs from Lucerne cartons marked with an "M" and offered to refund the purchase price of the eggs to any customer who returned a Hayre's carton with that marking. All Hayre's eggs produced during the period November 1979 to March 1980 and remaining in Safeway's stock were then disposed of in hazardous waste dumps.

In their first amended complaint, plaintiffs defined the class they wished to represent as all persons who purchased and/or consumed Lucerne eggs contaminated by chlordane. Discovery revealed Hayre's had commingled its good eggs with the contaminated eggs and there was no way to tell which of the eggs were contaminated. At the motion to certify that class, appellants argued for a class definition that included those who purchased contaminated eggs and also those who purchased Hayre's eggs during the relevant period which were commingled with the contaminated eggs. Because appellants argued for a different class definition than that set forth in the pleadings, the court denied the first motion to certify the class and allowed appellants leave to amend the complaint. Appellants filed a second amended complaint[2] amending the class definition and brought a second motion to certify the class. The denial of that second motion is the subject of this appeal.

---

[1]While the level of chlordane found in the eggs was low (measured in parts per million), the Environmental Protection Agency had not established a tolerance level for eggs as had been established for other agricultural products. Chlordane has been permitted to be sprayed on such agricultural crops as carrots, apples, beans, boysenberries and cabbage. (40 C.F.R. § 180.122, rev. Jul. 1, 1985.)

[2]Various theories of recovery are asserted in the second amended complaint and include causes of action for negligence, strict liability, breach of implied warranty, fraud, negligent misrepresentation, battery, civil conspiracy and violations of sections of the Health and Safety Code and Business and Professions Code.

The class proposed for certification in the second motion consists of two subclasses. Subclass A is defined as all residents of California, who between November 19, 1979 and March 13, 1980, purchased from Safeway and/or consumed, or whose family consumed, Lucerne eggs which had been produced by Hayre's and who thereby suffered economic harm. Subclass B is defined as all persons who ingested said contaminated eggs and who sustained personal injuries as a result.

The trial court denied certification of subclass A on the ground that the class was not ascertainable as an economic class that had suffered an economic loss. The court denied certification of subclass B on the ground that common questions of law and fact did not predominate on those claims arising out of personal injury. Appellants appeal the ruling as to subclass A only.

Appellants urge trial court error in two particulars: First, they contend there was a lack of substantial evidence supporting the court's conclusion that the "economic damage class" was not ascertainable; second, they contend that by considering whether the proposed class would prevail on the merits, the court used improper criteria in determining whether class certification was appropriate. Before addressing these specific contentions we deem it worthwhile to briefly comment on established legal principles particularly relevant to a review of the class certification proceeding before us.

"The class action is a product of the court of equity—codified in section 382 of the Code of Civil Procedure.[3] It rests on considerations of necessity and convenience, adopted to prevent a failure of justice." (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 458 [115 Cal.Rptr. 797, 525 P.2d 701]; *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 703-704 [63 Cal.Rptr. 724, 433 P.2d 732].) While the California Supreme Court has acknowledged its "general support of class actions," it has also recognized the "dangers of injustice" which sometimes accompany this type of litigation and "the limited scope within which these suits serve beneficial purposes." (*City of San Jose v. Superior Court, supra,* 12 Cal.3d at p. 459; *Collins v. Rocha* (1972) 7 Cal.3d 232, 238 [102 Cal.Rptr. 1, 497 P.2d 255]; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 810 [94 Cal.Rptr. 796, 484 P.2d 964]; *Daar v. Yellow Cab Co., supra,* 67 Cal.2d at p. 713.) Our Supreme Court "'has consistently admonished trial courts to carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts.'" (*Blue Chip*

[3]Code of Civil Procedure section 382, provides inter alia: ". . . when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

*Stamps* v. *Superior Court* (1976) 18 Cal.3d 381, 385 [134 Cal.Rptr. 393, 556 P.2d 755]; *City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at p. 459; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 810.) ■ The burden rests with the plaintiff to show that substantial benefits, both to the litigants and to the court, will result from class certification. (*City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at p. 460.)

It is without question that a consumer class action in many circumstances will result in substantial benefit to the parties and the court. "The class action has been held appropriate when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer [citations]." (*Blue Chip Stamps* v. *Superior Court, supra,* 18 Cal.3d at pp. 385-386.) Among the salutary by-products of the consumer class action are ". . . [the] therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims." (*Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 808.)

On the other hand it is equally without question that not all multiple consumer cases lend themselves to a class proceeding. Some limiting considerations were described by the Supreme Court in the *Blue Chip Stamps* case. "A factor in determining feasibility of the group approach is the probability each member will come forward ultimately, identify himself and prove his separate claim to a portion of the total recovery. [Citation.] [¶] However, when potential recovery to the individual is small and when substantial time and expense would be consumed in distribution, the purported class member is unlikely to receive any appreciable benefit. The damage action being unmanageable and without substantial benefit to class members, it must then be dismissed. [Citations.] And, when the individual's interests are no longer served by group action, the principal—if not the sole—beneficiary then becomes the class action attorney. To allow this is 'to sacrifice the goal for the going,' burdening if not abusing our crowded courts with actions lacking proper purpose. [Citations.]" [¶] While termination of a defendant's alleged wrongdoing is a factor to be considered [citation], it does not warrant group action for damage when the members will not recover damage, . . ." (18 Cal.3d at p. 386.)

In an effort to assure that class action proceedings are not utilized as instruments which "sacrifice the goal for the going," we are reminded that class actions are provided only as a means to enforce substantive law and that altering the substantive law to accommodate procedure is to confuse the means with the ends. (*City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at p. 462.)

To sustain any class action the requirements of an ascertainable class and a well-defined community of interest in the factual and legal issues presented must be met. (*Daar* v. *Yellow Cab Co.*, *supra*, 67 Cal.2d at p. 704.) Finally, we acknowledge the great discretion which rests with the trial court in the matter of class certification, and that a reviewing court will not disturb a trial court's certification ruling which is supported by substantial evidence unless, absent other error, improper criteria are used or erroneous legal assumptions are made. (*Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 133-134 [191 Cal.Rptr. 849].)

With this factual and legal background we look to the case at hand. The proffered class would obviously be numerous, the individual economic claims of the defined class members would necessarily be small claims,[4] and it does appear that a well-defined community of interest as to factual and legal issues would exist among all members of the defined class.

However, there exist several distinctive features to this litigation. Principal among them, and completely without California precedent in class action cases which we have come upon, is the factual reality that no individual member of the defined *economic* class will ever be able to come forward and prove that their purchased eggs were contaminated in whole or in part. Due to the commingling of 20 percent contaminated eggs with 80 percent noncontaminated eggs, each carton may have contained one or more contaminated eggs, *or none at all.*[5]

Also distinctive are undisputed facts demonstrating that immediately upon receiving notice of product contamination further distribution was voluntarily terminated, shelved eggs were destroyed, a recall was attempted and costly measures were undertaken by the egg producer to correct the problem so as to avoid recurrence.

Nor can we ignore the distinctive nature of the occurrence which gave rise to the problem in the first instance. We are not here involved with the conduct of a predatory seller, nor a situation where unwary consumers are being duped by some unscrupulous corporate undertaking, nor do we have

---

[4]Even if we were to accept plaintiffs' gross damage figure of $1,338,148 and divide by the plaintiffs' estimated 90,913 class members, individual recovery would approximate $15 per class member.

[5]In our factual summary we recounted that Hayre's eggs constituted only 20-30 percent of the eggs sold by Safeway under the Lucerne tradename; that Lucerne cartons containing Hayre's eggs were identifiable by the letter "M." Thus for a consumer to identify that Hayre's eggs were purchased, would require his recalling the "M" marked Lucerne carton, a highly unlikely occurrence further complicating the desired goal of a class proceeding that there be some probability of individual recovery.

an illegal scheme to cheat or overcharge consumers or competitors. The wrongdoing here is an accidental occurrence.

The trial court, exercising the discretion to which it is entitled, determined the class to be noncertifiable because it was not ascertainable as an economic class that had suffered economic loss. Plaintiffs asked the trial court, and now ask us, to do what no other California court has done: to certify an economic class where not all products sold to the class were defective and where the class members themselves do not know, and never will know, whether they purchased a defective product. We decline to take that step.

■ We first treat plaintiffs' claim that improper criteria were utilized in determining whether class certification was appropriate. They point to the trial court as ". . . repeatedly [concerning] itself with whether or not the plaintiffs could prove that the eggs had no [economic] value and/or that the class had been harmed." They cite *Anthony* v. *General Motors Corp.* (1973) 33 Cal.App.3d 699, 707 [109 Cal.Rptr. 254] for the proposition that "it is . . . inappropriate to determine class certification on whether or not the proposed class can prevail on the merits of its legal theories." *Anthony* requires merely a showing at the certification hearing that evidence supporting plaintiffs' theory may be available when the case goes to trial, not that plaintiffs will necessarily prevail. However, nothing in the *Anthony* decision can be construed as precluding a trial court determining at the certification proceeding whether "'the action is without merit.'" Quite to the contrary, *Anthony* specifically refers to the Supreme Court's recommendation that certification proceedings be modeled after Civil Code section 1781, subdivision (c)(3) which provides for a determination of whether "the action is without merit. . . ." (*Id.* at p. 707; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at pp. 820-821.) Similarly in *Petherbridge* v. *Altadena Fed. Sav. & Loan Assn.* (1974) 37 Cal.App.3d 193 [112 Cal.Rptr. 144], the reviewing court found that the trial court had properly inquired into the merits of plaintiff's claimed conspiracy at the certification proceeding and affirmed a judgment of dismissal when plaintiff failed to demonstrate a substantial possibility that she could prove the existence of a civil conspiracy.

Here, the concerns of the trial court as to plaintiffs' ability to prove the eggs had no economic value, or that the purported class had been harmed, were legitimate concerns directed to the question of whether the action was without merit. If there existed a demonstrated inability to prove loss or harm, then clearly the action was without merit.

The situation confronting the trial court in *Anthony* v. *General Motors Corp., supra,* 33 Cal.App.3d 699, was substantially different from that

facing the trial court here. In *Anthony*, ". . . the gravamen of plaintiffs' case is the contention that *all* wheels of the type involved contain an inherent defect which may cause them to fail. . . ." (*Id.* at p. 704.) Here, only a relatively small percentage of the commingled eggs were contaminated and no method existed to distinguish the contaminated from the uncontaminated. We find no merit in the contention that improper criteria were used in determining whether class certification was appropriate.

 Next we look to plaintiffs' contention of lack of substantial evidence to support the lower court's conclusion that the economic damage class was not ascertainable. Again, we disagree with their position.

We are cognizant of the principle that if the existence of an ascertainable class has been shown, there is no need to identify its individual members as a prerequisite to maintaining a class suit. (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d at p. 706.) However, we are not concerned with identification of individual class members. Our concern rests with the perceived inability of *any* class member to prove a case. Ultimately each individual class member must prove his separate claim to a portion of the class recovery and that is one factor to be considered in determining whether a class action is proper. (*Id.* at p. 713.) The Supreme Court has put the matter another way by stating: "A factor in determining feasibility of the group approach is the probability each member will come forward ultimately, identify himself and prove his separate claim to a portion of the total recovery." (*Blue Chip Stamps* v. *Superior Court, supra,* 18 Cal.3d at p. 386.) Here, that expectation of probability is nil. As no single member of the economic class can prove that he or she purchased a carton of eggs contaminated by one or more eggs with chlordane tracing then, as the trial court correctly found, there is no ascertainable class. We cannot resort to speculation and conclude that all cartons sold to consumers contained one or more contaminated eggs, anymore than we can speculate that 80 percent of the cartons were without contaminated eggs. There is simply no way for us, for the trial court, or for the individual class member to determine whether, in any particular transaction, contamination was or was not present.

It is no answer for plaintiffs to contend in hindsight that the commingling resulted in the eggs being without market value. They offer the fact of Safeway's postnotice destruction of its shelved Hayre's eggs to prove the point. The only point proved however is that the shelved eggs no longer had a market value to Safeway because of their unsalability. It does not prove that a purchaser of uncontaminated eggs did not receive the full benefit of the transaction.

■ California law has long required that a person suffer detriment in order to have a claim for recovery of damages. In *Whipley* v. *J. H. McKune* (1859) 12 Cal. 352, 357-358, the court stated "The universal rule is, that an act, however erroneous, which does no injury to a party, cannot be the subject of legal complaint on his part." Equally fundamental is the legal standard which imposes on plaintiff the burden of proving his damage, an element of his cause of action. (1 Witkin, Cal. Evidence, (3d ed. 1986) §§ 131, 132, pp. 116-117.) If a plaintiff cannot meet these legal prerequisites, no cause of action exists. If multiple plaintiffs fail to meet these elementary standards, no ascertainable class exists. This is completely in keeping with the admonition of the Supreme Court which we referred to earlier but now repeat: "Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going." (*City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at p. 462.)

The cases cited by plaintiffs to support their position for an ascertainable class are readily distinguishable from the case at bar. In *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, every taxicab driver allegedly overcharged every passenger by the same excessive rate, over the same period of time, utilizing the mechanism of meter fixing. In *Cartt* v. *Superior Court* (1975) 50 Cal.App.3d 960 [124 Cal.Rptr. 376], each credit cardholder purchased the same Chevron F-310 gasoline at a premium price established on the basis of certain performance representations which were alleged to be false. In *Lazar* v. *Hertz Corp., supra,* 143 Cal.App.3d 128, each car renter, over a four-year period, was allegedly overcharged for gasoline upon return of a rented vehicle with less than a full tank. In *Bruno* v. *Superior Court* (1981) 127 Cal.App.3d 120 [179 Cal.Rptr. 342], the class members were consumers, all of whom were subjected to unlawfully fixed milk prices by the three defendant supermarket corporations. In *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, the members of the consumer class had each entered into installment contracts for frozen food and freezers and were subjected to common misrepresentations alleged to be false. In *Collins* v. *Rocha, supra,* 7 Cal.3d 232, the class consisting of farm workers were each subjected to alleged false representations by the defendant labor contractor. In *Rosack* v. *Volvo of America Corp.* (1982) 131 Cal.App.3d 741 [182 Cal.Rptr. 800], the class consisted of all retail automobile purchasers who between 1967 and 1976 were subjected to a pricing scheme in violation of California's antitrust legislation, the Cartwright Act. In *Anthony* v. *General Motors Corp., supra,* 33 Cal.App.3d 699, to which we have already referred, all wheels purchased by the class members were alleged to be defective.

Nowhere within this litany of cases do we find anything remotely comparable to the case under review. Each identifies a common harm or damage

necessarily resulting from conduct or transactions common to all. None confront the factual situation before us, where the transactions may or may not have resulted in harm.

Substantially similar to the present litigation is that which confronted a federal District Court in *Feinstein* v. *Firestone Tire and Rubber Co.* (S.D.N.Y. 1982) 535 F.Supp. 595.[6] There the court was asked to certify a class whose members had purchased defective tires from Firestone. A majority of the class members had suffered no injury or accident-related property damage because of the tires. Those plaintiffs claimed "that the purchase of a defective tire, *ipso facto*, caused economic loss" to the class members. (*Id.* at p. 602.) The court held that "Plaintiffs' bald assertion that a 'common' defect *which never manifests itself 'ipso facto* caused economic loss' and breach of implied warranty is simply not the law." (*Id.* at p. 603.) That court concluded "Since it appears that the majority of the putative class members have no legally recognizable claim, [fn. omitted] the action necessarily metastasizes into millions of individual claims." (*Ibid.*)

The same result was reached in *McElhaney* v. *Eli Lilly & Co.* (D.S.D. 1982) 93 F.R.D. 875. That plaintiff sought to represent a class of all persons who had been exposed to DES prior to birth. That court held "The definition of a class cannot be so broad as to include individuals who are without standing to maintain the action on their own behalf. Each class member must have standing to bring the suit in his own right. [Citations.] In the case at bar, plaintiff does not allege that any member of the class, other than herself, has sustained injury or damage. Since many individuals included in the purported class have sustained no injury in fact, they would lack standing to bring suit in their own right. [¶] . . . The proposed class, in this Court's view, is not adequately defined, nor are its members readily identifiable. The failure to establish the existence of a class, alone, is enough to deny class certification." (*Id.,* at p. 878.)

█ Earlier in this opinion we noted the Supreme Court decisions requiring the trial courts to "carefully weigh respective benefits and burdens" and "to allow maintenance of the class actions only where substantial benefits accrue both to litigants and the courts." It seems to be a self-evident proposition that where no member of the class can prove a case, there can be no substantial benefit to the litigants. Plaintiffs, however, would have us certify an economic damage class by asserting that substantial benefits will inure to the class through the employment of a "fluid recovery" method

---

[6]Where California courts have not addressed an issue, they look to federal cases as persuasive authority on class action questions. *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d at p. 708; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 821.

of distribution. Justice Morris of the Fourth Appellate District observed that: "The topic [i.e., "fluid recovery"] regularly arises . . . where the class has many members with relatively small individual claims. In such circumstances, if the class recovers a favorable judgment, it is likely that only a fraction of the class members will have the desire, and documentation, to file an individual claim for part of the damages. Fluid class recovery is thus invariably suggested as a way to distribute the usually substantial amount of remaining damages." (*Bruno* v. *Superior Court, supra,* 127 Cal.App.3d at p. 123.)

Plaintiffs have cited us to no authority, nor have we discovered any, where fluid recovery has been permitted to serve as a substitute for the elementary duty of a plaintiff to prove damage, an essential part of the cause of action. As noted by the Supreme Court in the recent case *State of California* v. *Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564], "The propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action." No doubt one such purpose is to recompense class members who are able to prove their individual claim of damage. Where the circumstances of the case demonstrate the inability of any class member to provide the proof required for individual compensation, then obviously there is no useful purpose served in maintaining a class action on behalf of individual class members.

But plaintiffs go on to assert that the fluid case recovery is "consistent with the philosophy behind *Darr* [*sic*] and *Vasquez* that class actions serve the important function, when individual lawsuits are not feasible, of returning ill-gotten gains from the hands of those who have engaged in unlawful practices." The Supreme Court in *Levi Strauss* also recognizes that general principle with the following statement: "Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. [Citation.] Without fluid recovery, defendants may be permitted to retain ill-gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts." (*State of California* v. *Levi Strauss & Co., supra,* 41 Cal.3d at p. 472.)

Though observing that an essential predicate of the above proposition is "harm" to people, we nevertheless elect to comment on whether the circumstances of this case justify the utilization of fluid recovery as "essential to ensure that the policies of disgorgement or deterrence are realized." We think not. Clearly the imposition of a fluid method of distribution could have no useful effect on the policy of deterrence because it will forever remain beyond the capability of law to deter accidental occurrences. Nor are we satisfied that any public purpose is served in this case by requiring

"disgorgement" based on the simplistic premise that consumers *may* not have gotten exactly what they bargained for.

Where, as here, the occurrence is of an accidental nature, the defendants are shown to have responded immediately to protect the public, where steps were taken at considerable economic cost to prevent recurrence, and where all but a relatively small portion of the "ill-gotten gain" was in fact consumed in the production, sorting, packaging, shipping and marketing of the contaminated product, we do not believe fluid recovery is useful in fulfilling the purpose of the underlying action. Better that the fluid method of distribution be reserved for those cases where public policy will be served by curbing the excesses of the predatory and the unscrupulous or where substantial harm to the class is demonstrable.

We affirm the trial court's order denying class certification.

Kline, P. J., and Smith, J., concurred.