[No. B224318. Second Dist., Div. Three. Oct. 26, 2011.]

PAUL MARTIN DAVIS-MILLER et al., Plaintiffs and Appellants, v. AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Defendant and Respondent.

[No. B224320. Second Dist., Div. Three. Oct. 26, 2011]

AMY REED, Plaintiff and Appellant, v. AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Defendant and Respondent.

## COUNSEL

Audet & Partners and Joshua C. Ezrin for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps and John T. Brooks for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—In this matter, we have consolidated two appeals. Both arise from the denial of plaintiffs' motions for class certification. In the first, plaintiffs and appellants Paul Martin Davis-Miller (Davis-Miller),[1] Barbara L. Keeler (Keeler), Mickey Michel (Michel) and Howard R. Miller (Miller) (together, the Davis-Miller plaintiffs) appeal from an order denying their motion for class certification in their action against defendant and respondent Automobile Club of Southern California (Auto Club). In their complaint, these plaintiffs alleged violations of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.; henceforth UCL),[2] negligent misrepresentation and omission, intentional misrepresentation and omission, fraud and unjust enrichment in connection with respondent's operation of a roadside battery service program that provides jump-starts and sells and installs batteries for stranded motorists.

In the second appeal, plaintiff and appellant Amy Reed (Reed) seeks to reverse an order denying her motion for class certification in her action against the same defendant and respondent. However, Reed's complaint alleged violations of the Consumers Legal Remedies Act (Civ. Code, § 1750

---

[1] Plaintiff Davis-Miller was voluntarily dismissed from this litigation on October 2, 2009. Therefore, the remaining named plaintiffs include only Keeler, Michel and Miller.

[2] Business and Professions Code section 17200 defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Each of these three prongs—unlawful, unfair, or fraudulent—implicates a different legal standard, although a single practice may simultaneously violate more than one prong of the UCL.

et seq.; henceforth CLRA) and a common count for money had and received in connection with respondent's operation of the same roadside battery service program.

The trial court, in a consolidated opinion addressing both cases, denied plaintiffs' motions for class certification mainly on the basis that common issues did not prevail, specifically concluding that plaintiffs failed "to meet their burden of establishing substantial evidence of a well-defined community of interest," inter alia. The trial court also granted Auto Club's motion for an order that the putative class could not be certified and denied plaintiffs' motion to strike[3] Auto Club's motion on the same rationale.

Because both appeals involve claims arising from the same operative facts, we similarly resolve them both in one decision, taking into consideration the distinct legal standards and applicable facts where necessary. As substantial evidence supports the trial court's factual findings with respect to both cases and the trial court properly applied the law, we will affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*[4]

Auto Club is a nonprofit mutual benefit corporation and a regional AAA (American Automobile Association) motor club. It licenses the use of the AAA trademark from AAA National, which coordinates nationwide programs that regional motor clubs may offer including the roadside battery assistance program at issue.

The United States subsidiary of Club Assist LLC (Club Assist), an Australian company, provides roadside battery service programs through contracts with AAA National. Under this program, when an AAA member's car will not start, a technician will drive to the member's location in a service truck equipped with a sophisticated battery tester and a supply of new batteries that includes a selection that covers most types of cars. The battery tester determines the conductance and the voltage of the battery to assist the customer in making a decision regarding whether to replace the battery on the spot versus simply having the technician jump-start the car.

---

[3] Only the Davis-Miller plaintiffs filed a motion to strike.

[4] The factual and procedural background is drawn primarily from the trial court's extensive opinion, as well as from the record, which includes, with respect to the Davis-Miller appeal, a six-volume clerk's transcript (CT), a one-volume supplemental clerk's transcript and a one-volume reporter's transcript (RT). The record also includes, with respect to the Reed appeal, a one-volume RT and a five-volume CT, which is largely duplicative of the Davis-Miller record.

### 1. The Roadside Battery Service Program

Under the terms of the arrangements between Club Assist and each independent contracting station (ICS) that provides roadside assistance through AAA National and regional motor clubs, including Auto Club, Club Assist both provides the batteries and trains the technicians how to use the battery tester. Each ICS can sell the batteries to both AAA members and nonmembers, but must charge the AAA members $25 less than the general public. In 2009, the member prices for batteries ranged from $105 to $140, depending on the make and model of the car. There is no additional charge for installation.

After selling a battery, each ICS pays the wholesale price to Club Assist, retaining the remaining balance of the sale price. If the sale was made to an AAA member, Club Assist then must pay the participating regional AAA motor club a fee of $9.[5]

### 2. The Majority of AAA Members Who Purchased Batteries Needed New Batteries

Batteries for modern cars have an average life expectancy of three to four years which results in a need for replacement of between 25 percent and 33 percent of all car batteries each year. Car batteries that have failed at least once are more likely to need to be replaced. The conductance battery test used by ICS technicians provides useful data regarding the "remaining reliable life of the tested battery." Most of the batteries that were replaced by the ICS technicians had failed the conductance test. Only a small number of batteries are replaced without such a test being performed, for reasons such as when the battery is too deeply discharged to test, if the battery is leaking or bulging due to plate expansion and cannot be safely tested, or if a member requests a battery be replaced without testing.

The battery replacement rate of ICS technicians under the roadside battery assistance program is approximately 22 percent, which is lower than the average annual replacement rate. Moreover, because, by definition, the AAA members who purchased batteries through the program had batteries that failed at least once, the 22 percent rate is potentially substantially lower than the average rate for similar batteries.

Additionally, many other factors individual to each AAA member affect the likelihood that his or her battery will need to be replaced. These factors may include the age of the battery, the testing result, any history of prior battery

---

[5] This fee was originally $7.50 but was later increased to $9.

failures, the frequency or infrequency at which the car is driven, the usage—short or long trips—and sufficiency of such usage to recharge the battery, excessive car vibration, and whether the battery has been exposed to high temperatures.

3. *Named Plaintiffs Have Not Shown Their Batteries Were Unnecessarily Replaced*

Two of the three named plaintiffs in the Davis-Miller case, Miller and Michel, did not even allege that their batteries could still hold a charge. Both Miller's and Michel's batteries failed the conductance test administered onsite by an ICS technician. In his deposition, Miller stated that he had no reason to believe that the test performed on his battery was inaccurate or that the old battery was still viable. Prior to replacement, Michel's battery had failed on two separate occasions, increasing the likelihood that the battery was no longer reliable. Moreover, Michel drove her vehicle less than 2,000 miles per year, a factor that is likely to reduce the life of a battery.

Only plaintiff Keeler alleges that her battery was replaced unnecessarily. The record contains no evidence as to whether Keeler's battery was subjected to the conductance test by the ICS technician. But, as mentioned above, there are many reasons why a battery may not be tested. For example, the battery may have been too deeply discharged or unsafe to test. Like Michel, Keeler's mileage was low; she drove her vehicle only a few hundred miles per year, usage that is known to reduce a battery's expected useful life. In her deposition, Keeler stated that she retained her old battery and that she believed her husband tested it but she did not see him do so. She stated that he told her he "knew it was still good." However, it was not determined whether the battery was reliable and could actually start a car.

Plaintiff Reed had her car towed to her boyfriend's house after it would not start. Her boyfriend, John Romero, believed the problem was related to the battery. Reed called AAA to request a jump-start. Reed's battery failed the conductance test administered by the ICS technician who responded to her call. Based on the test, the ICS technician recommended to Romero (while Reed remained inside the house) that a new battery be installed. Romero, after discussing the option with Reed and without mentioning any member discount, had the new battery installed. Romero took the old battery to a garage and had it recharged. Romero kept the battery in his garage at home but since has not reinstalled it in any car to determine whether the battery is reliable or could actually start a car.

### 4. *The Proposed Class Was Not Uniformly Exposed to the Allegedly False Advertising*

AAA members receive copies of Westways Magazine. The roadside battery assistance program was advertised in Westways in San Diego during the second year of the class period and only a small number of times in Southern California thereafter.

During the nine-year proposed class period, program ads were included in MemberSaver guides available to walk-in customers for only 16 months. The program was mentioned in renewal mailers during only three months of the proposed class period.

Additionally, Auto Club included ads for the program on its Web site. However, the page discussing the program received only a few thousand "hits" annually—which is an insignificant number (less than 0.2 percent of Auto Club's nearly six million members).

Sales invoices typically delivered to customers after they purchase a battery intermittently referred to the member discount and free installation as well. Two of the three named plaintiffs in the Davis-Miller case, however, gave little consideration to the invoices they received. Miller stated that he did not read his invoice and Keeler stated she had no recollection of whether she read the invoice or not.

Of the customer declarations provided, the majority had never seen an ad for the roadside battery assistance program. More than half had never heard of the program prior to calling Auto Club for service. The majority of declarants stated that either the ICS technician did not mention any member discount, or they did not recall the ICS technician's mentioning any member discount. The only declarant who stated that the ICS technician mentioned a member discount also noted that the discount did not matter because she previously paid more for a car battery and wanted the new battery installed on the spot without the hassle of going elsewhere.

Two of the three named plaintiffs in the Davis-Miller case (Keeler and Michel) admitted that they never saw any roadside battery assistance program ads prior to purchasing a battery through the program. Only plaintiff Miller states that he recalled seeing an article in Westways describing the program and receiving a mailer that included the program in the list of member benefits. However, Miller stated that the member discount did not matter because he appreciated the time savings and convenience of on-the-spot battery replacement and installation.

Reed also stated that she did not know that Auto Club offered the roadside battery assistance program until she called AAA for service and that she had

never seen any program ads, had not received Westways, had never visited Auto Club's Web site, had never been to an Auto Club office and had not received any mailers describing the program. Moreover, the ICS technician did not mention any member discount to either Reed or Romero. Not only did Reed not see the invoice until after she purchased the battery, she also admitted that the invoice played no role in her decision to buy the battery.

### 5. *The Joint Hearing*

The trial court held a joint hearing with respect to both cases on Monday, January 25, 2010, and on Tuesday, January 26, 2010. The trial court's order was filed on April 23, 2010.

The trial court separated plaintiffs' claims into two factual bases for recovery. "The first theory of recovery is that Auto Club engages in false advertising through misrepresentations (disseminated in advertising and at point of sale) that batteries are sold with a member discount and with free installation and labor." The trial court referred to this theory as the "false advertising" cause of action. And "[t]he second theory of recovery is that Auto Club unnecessarily replaces properly functioning batteries through the use of systemic incentives for its contractors to sell unneeded batteries, and by failing to adequately train and oversee contractors to ensure that field test results do not inaccurately recommend battery replacement when a simple jump start will suffice." The trial court referred to this theory as the "unnecessary replacement" cause of action. The trial court then analyzed each theory under the class certification rules applicable to UCL and CLRA claims.

### a. *UCL Class Certification Requirements*[6]

With respect to plaintiffs' UCL claims, the trial court relied on Code of Civil Procedure section 382, which "allows the maintenance of a class action when the plaintiff can establish the existence of both an ascertainable class and a well-defined community of interest among the class members." (See *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964]; Code Civ. Proc., § 382.) The trial court found that the class plaintiffs sought to certify was sufficiently ascertainable. With respect to the

---

[6] Additionally, the party seeking certification must demonstrate that the proposed class action is manageable which requires the trial court to "carefully weigh the respective benefits and burdens of a class action and to permit its maintenance only where substantial benefits will be accrued by both litigants and the courts alike." (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1275 [242 Cal.Rptr. 339].) The trial court, however, did not rule with respect to the manageability requirement because, we presume, it found that plaintiffs failed to produce substantial evidence of a well-defined community of interest. As this issue is not before us today, we decline to discuss it further.

question of whether there was a sufficiently well-defined community, the trial court stated that its analysis included the following "three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].)

### b. CLRA Class Certification Requirements

With respect to plaintiffs' CLRA claims, the trial court utilized Civil Code section 1781, "which sets out the four conditions that, if met, mandate certification of a class: (1) it is impracticable to bring all members of the class before the court; (2) the questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members; (3) the claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class; and (4) the representative plaintiffs will fairly and adequately protect the interests of the class."

### c. Commonality (UCL and CLRA)

#### (1) Unnecessary Replacement Cause of Action

In its analysis, the trial court treated the commonality requirements[7] under the UCL and the CLRA essentially the same with respect to the unnecessary replacement cause of action and found that plaintiffs failed to meet their burden.

Without detailing its analysis in the opinion, with respect to the UCL claim, the trial court found that plaintiffs were not able to demonstrate common questions of fact[8] with respect to plaintiffs' unnecessary replacement cause of action. Specifically, the trial court found that "[w]hether or not the unnamed class members' batteries were unnecessarily replaced is not an issue

---

[7] The commonality requirement for the UCL is whether there are predominant common questions of law or fact among class members. Under the CLRA, it is whether the questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members. (Code Civ. Proc., § 382; Civ. Code, § 1781.)

[8] The trial court described this as plaintiffs' failure "to demonstrate a community of interest." However, we presume the trial court meant to refer to the first prong of the community of interest requirement as set forth in *Richmond v. Dart Industries, Inc.*, and *Sav-On Drug Stores, Inc.*, because this section of the decision discusses plaintiffs' failure to produce sufficient evidence of commonality. Both typicality and adequacy, the other two prongs of the community of interest requirement, are addressed in later sections of the trial court's opinion.

common to the broadly-defined class and will require individualized inquiries into [each member's] battery's age, condition, history, testing, etc." As a result, the trial court continued, there are no common questions of fact amongst the members of a class that encompasses those who needed a new battery and those who did not.

The trial court determined that under the CLRA, plaintiffs must show actual injury as to each class member or a classwide injury and that "[u]nnamed class members who actually needed and received a new battery could not have suffered any damage by Auto Club's conduct . . . , no matter how inaccurate the field testing or how egregious the pressure on contractors to sell batteries." The trial court relied on Auto Club's evidence showing that the average ratio of battery replacements to jump-starts during the class period is 22.08 percent, never exceeding 25.3 percent, in any given year which is similar to replacement rates in traditional service locations. As a result, the trial court reasoned, "[e]vidence (though disputed) and common sense suggest that a more significant number of the class" is comprised of class members who actually needed their battery replaced.

### (2) *False Advertising Cause of Action*

Similarly, the trial court addressed the commonality requirements under the UCL and the CLRA together with respect to plaintiffs' false advertising cause of action and found that plaintiffs failed to produce sufficient evidence of such commonality.

The trial court analogized the two cases to *Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966 [101 Cal.Rptr.3d 37], and *Pfizer, Inc. v. Superior Court* (2010) 182 Cal.App.4th 622 [105 Cal.Rptr.3d 795] (*Pfizer*), because both involved allegedly false representations to which large numbers of class members are not likely to have been exposed. The trial court found that there was no evidence that the advertising and marketing of the battery service program was seen by the entire class and that substantial evidence shows that many members purchased batteries with no exposure to the advertising. Specifically, the trial court found that the advertisements in Westways, the member magazine, were made "in a sporadic and limited manner," and that any exposure via the Auto Club's Web site to advertisements was minimal. "Thus, only a small portion of the classes in both actions are likely to have seen the alleged false advertising, and even among that small portion, there is no basis to uniformly infer that the advertising was material to the purchase of decisions of large numbers of the class."

The trial court also found that, with respect to representations in sales invoices, such representations are not subject to common proof because the

service contractors providing roadside battery assistance program services used a variety of invoice forms, many of which make no reference to member discounts or free installation and any reliance on such invoices is unlikely because they are presented after the transaction is complete. Similarly, oral representations by the "service contractors or telephone operators responding to the calls of stranded members are by their nature inherently not common to the class (without proof of the universality of such representations, which plaintiff does not submit)" and thus such representations "cannot be proven without individual, case-by-case testimony."

### d. Typicality (UCL and CLRA)

Without setting forth its entire analysis in the opinion, the trial court concluded that "for the same reason that commonality is lacking factually as to the two factual theories, it follows that the named plaintiffs' claims are not really typical of those of the class" in part because "at least some of the named plaintiffs did not even personally suffer from the alleged problem which they seek to redress."

### e. Adequacy (UCL and CLRA)

In addressing the adequacy prong under the community of interest requirement, the trial court found that plaintiffs also failed to show that the named representatives in both actions adequately represent the classes because they lack standing to assert the claims alleged in the respective complaints.

With respect to plaintiffs' UCL claim, the trial court noted that "Proposition 64 requires that the named representative in a UCL action must have suffered actual injury and loss of money or property caused by the defendant's unfair competition." (See Bus. & Prof. Code, § 17204.) The trial court then found that all three of the Davis-Miller plaintiffs, Keeler, Michel and Miller, admit that they did not rely on roadside battery service program advertising and thus any injury such plaintiffs may have suffered could not have been caused by Auto Club, which such cause is required to be shown with respect to plaintiffs' false advertising cause of action. Further, the court found that because only Keeler of the three kept her old battery, the bulk of plaintiffs could not show that each suffered injury under the unnecessary replacement theory, which makes them inadequate representatives.

With respect to plaintiffs' CLRA claim, the trial court pointed out that Civil Code section 1780, subdivision (a) contains the standing requirement "that '[a]ny consumer who suffers any damages *as a result of* the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action' under the CLRA." The court found that

"Reed admitted in her deposition that she did not see any battery service advertising before purchasing a new battery," and therefore, "cannot have been harmed as a result of any inaccuracies in the advertising," making "her an inadequate representative of the class she seeks to represent."

### f. *Impracticality (CLRA)*

In addition to the findings discussed above, the trial court also concluded that, consistent with the CLRA class action requirements, "[i]t is impracticable to bring all members of the classes before the [c]ourt."

### g. *Class Treatment Found Not to Be the Superior Method of Adjudication*

Finally, the trial court concluded that because plaintiffs failed to meet their burden of establishing a well-defined community of interest among the proposed class and failed to offer any other reasons the trial court determined were persuasive as to why the cases should be allowed to proceed as class actions, proceeding as a class is not superior to other methods of adjudication in either case.

Plaintiffs timely filed two separate notices of appeal on May 10, 2010.

## *ISSUES ON APPEAL*

Having lost their motion for class certification on the bases on which it was brought, the Davis-Miller plaintiffs attempt to expand their arguments for class certification on appeal. These plaintiffs now attempt to argue that the trial court failed to analyze the issue of standing with respect to both the unlawful and the unfair prongs of the UCL. However, as noted above, the Davis-Miller plaintiffs failed to argue this contention as a basis for class certification before the trial court. Because this issue was not before the trial court when it ruled on the motion for class certification, we decline to consider it now. (*People ex rel. Dept. of Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46 [129 Cal.Rptr.2d 60].) Instead, we limit our consideration to only the theories on which plaintiffs pursued class certification below.[9]

In both appeals, plaintiffs argue that the order cannot be upheld on any basis, because the trial court erred, both in its application of the law and its

---

[9] In their motion for class certification, the Davis-Miller plaintiffs focused only on certain limited violations of the UCL and included no discussion or arguments regarding the other causes of action stated in the complaint. Therefore, with respect to the Davis-Miller plaintiffs' appeal, we decline to discuss any other causes of actions other than the aforementioned UCL-based causes of action.

resolution of the factual issues. Specifically, plaintiffs have two contentions before us today: (1) the trial court committed reversible error by relying on inaccurate factual assertions by respondent and incorrect legal standards with respect to the commonality requirement; and (2) the trial court applied the wrong test for standing under the adequacy requirement. We disagree, concluding that the trial court's order was well supported by substantial evidence, and is in accord with the law as set forth in similar cases.

## DISCUSSION

### 1. Standard of Review

A lower court's ruling on a motion for certification of a class is reviewed for abuse of discretion. (*Sav-On Drug Stores, Inc. v. Superior Court, supra,* 34 Cal.4th at p. 326.) " 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [I]n the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]." ' [Citations.]" (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*).) "Where a certification order turns on inferences to be drawn from the facts, ' "the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287 [119 Cal.Rptr.2d 190].)

### 2. UCL Class Action Requirements

■ Code of Civil Procedure section 382 permits a class action suit in UCL cases " 'when " 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' " ' " (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843 [100 Cal.Rptr.3d 637] (*Kaldenbach*).) "To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" ' [Citation.] [¶] As the moving party, [plaintiffs] bore the burden of establishing the propriety of class certification. [Citation.] . . . [Citations.] [¶] Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. [Citation.] But on appeal from the denial of class certification, we review the reasons given by the trial

court for denial of class certification, and ignore any unexpressed grounds that might support denial. [Citation.] We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. [Citation.]" (*Kaldenbach*, 178 Cal.App.4th at pp. 843–844.)

■ In general, and with respect to both of plaintiffs' theories of recovery, " 'we do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice.' " (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 945 [124 Cal.Rptr.3d 565] (*Knapp*); see also *Pfizer, supra*, 182 Cal.App.4th at p. 632.) With respect to the Davis-Miller plaintiffs' contention based on the unnecessary replacement theory, under *Knapp* and *Pfizer*, plaintiffs must have produced evidence showing that consumers' batteries were replaced unnecessarily, the allegedly wrongful business practice, and that such unnecessary replacement is an issue common to the proposed class.

■ With respect to the Davis-Miller plaintiffs' contention based on allegations under the false advertising theory, " '[t]o state a claim under . . . the UCL . . . based on false advertising or promotional practices, "it is necessary only to show that 'members of the public are likely to be deceived.' " ' " (*Tobacco II, supra*, 46 Cal.4th at p. 312.) A representative plaintiff need not prove that members of the public were actually deceived by the practice, relied on the practice, or suffered damages. (*Pfizer, supra*, 182 Cal.App.4th at p. 630; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1144 [111 Cal.Rptr.2d 296].)

■ Nonetheless, a class action cannot proceed for a fraudulent business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class. (*Knapp, supra*, 195 Cal.App.4th at p. 944; *Kaldenbach, supra*, 178 Cal.App.4th at p. 850.) Specifically, when the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class. (*Knapp, supra*, 195 Cal.App.4th at p. 944; *Kaldenbach, supra*, 178 Cal.App.4th at p. 850; see also *Pfizer, supra*, 182 Cal.App.4th at p. 632.)

### 3. *CLRA Class Action Requirements*

■ Unlike under the UCL, it is Civil Code section 1781, subdivision (b) that governs class action certification under the CLRA. One of the main distinctions between them is that, if the following requirements are satisfied,

a court *must* certify the class. (Civ. Code, § 1781, subd. (b); see *Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 140 [142 Cal.Rptr. 325].) The requirements are: " '(1) [i]t is impracticable to bring all members of the class before the court[;] (2) [t]he questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members[;] (3) [t]he claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class[; and] (4) [t]he representative plaintiffs will fairly and adequately protect the interests of the class.' (Civ. Code § 1781, subd. (b) . . . .) The trial court, however, has 'considerable latitude' under those four conditions in deciding whether a class action is proper. [Citation.]" (*Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145, 153 [104 Cal.Rptr.3d 329], citation omitted.)

■ "The CLRA declares numerous practices in the sale of goods or services to consumers to be unlawful. [Citation.] . . . The CLRA then provides that '[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful . . . may bring an action against that person to recover or obtain' actual damages, an injunction, restitution, and punitive damages. [Citation.]" (*In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 128–129 [103 Cal.Rptr.3d 83], fn. omitted.)

With respect to Reed's unnecessary replacement theory of recovery, under the CLRA, relief is limited to consumers who have suffered, in fact, damage as a result of an illegal practice. (Civ. Code, § 1780, subd. (a).) In other words, injury must be proven as to each member of the class. (*Steroid Hormone Product Cases, supra*, 181 Cal.App.4th at p. 155.)

■ The following applies with respect to Reed's false advertising contention. "The language of the CLRA allows recovery when a consumer 'suffers any damage as a result of' the unlawful practice. [Citation.] This provision 'requires that plaintiffs in a CLRA action show not only that a defendant's conduct was deceptive but that the deception caused them harm.' [Citation.] Causation, on a classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class. [Citation.] This is so because a representation is considered material if it induced the consumer to alter his position to his detriment. [Citation.] That the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one. ' "[P]laintiffs [may] satisfy their burden of showing causation as to each by showing materiality as to all." ' [Citation.] In contrast, however, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is

properly not certified as a class action. [Citation.]" (*In re Vioxx Class Cases, supra*, 180 Cal.App.4th at p. 129.)

### 4. *Commonality*

The Davis-Miller plaintiffs contend that they "sought certification of a class of battery purchasers, some of whom unnecessarily purchased a battery as a result of AAA's unlawful business practices" and therefore, under the *Tobacco II* court's interpretation of *Collins v. Safeway Stores, Inc.* (1986) 187 Cal.App.3d 62 [231 Cal.Rptr. 638] (*Collins*), the lower court was in error for denying the motion. Similarly, Reed asserts that the trial court erred in concluding that the class is not certifiable on the basis that the class includes members who potentially purchased batteries under the program as a result of accurate conductance tests. Reed contends, citing *Tobacco II*, that "where, as here, there is an unlawful business practice, and 'the "money or property" of the entire class of purchasers "may have been acquired by means" of an unfair practice,' the class is thus entitled to restitution for their loss."

Additionally, plaintiffs assert that the trial court erred in concluding that class certification is not permissible on the basis that the alleged false advertising was not "uniformly made to or considered by members." The Davis-Miller plaintiffs contend that "*Tobacco II* held that 'relief under the UCL is available without individualized proof of deception, reliance, and injury' [and that] the correct legal standard is not whether the absent class members were actually deceived, as the trial court required, but whether members of the public are likely to be deceived." Reed contends that, under *Steroid Hormone Product Cases, supra*, 181 Cal.App.4th 145, reliance could be inferred because the misrepresentations regarding the price of the battery replacement service are material under a "reasonable person standard."

### a. *The Trial Court Applied the Correct Legal Standard*

As the commonality requirement under the UCL and the CLRA are substantially similar, we address them simultaneously as one requirement below.

Plaintiffs rely heavily on *Tobacco II* to support their contention that the trial court erred in its interpretation of the applicable law. However, "*Tobacco II* held that, *for purposes of standing* in context of the class certification issue in a 'false advertising' case involving the UCL, the class members need not be assessed for the element of reliance. Or, in other words, class certification may not be defeated *on the ground of lack of standing* upon a showing that class members did not rely on false advertising. In short, *Tobacco II* essentially ruled that, *for purposes of standing*, as long as a single

plaintiff is able to establish that he or she relied on a defendant's false advertising, a multitude of class members will also *have standing*, regardless of whether any of those class members have in any way relied upon the defendant's allegedly improper conduct." (*Cohen v. DIRECTV, Inc., supra*, 178 Cal.App.4th at p. 981, original italics.)

Here, as in *Cohen*, *Tobacco II* is "irrelevant because the issue of 'standing' simply is not the same thing as the issue of 'commonality.' Standing, generally speaking, is a matter addressed to the trial court's jurisdiction because a plaintiff who lacks standing cannot state a valid cause of action. [Citations.] Commonality, on the other hand, and in the context of the class certification issue, is a matter addressed to the practicalities and utilities of litigating a class action in the trial court. We see no language in *Tobacco II* that suggests to us that the Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification. On the contrary, the Supreme Court reiterated the requirements for maintenance of a class action, including (1) an ascertainable class and (2) a ' "community of interest" ' shared by the class members. [Citation.]" (*Cohen v. DIRECTV, Inc., supra*, 178 Cal.App.4th at p. 981.)

Instead of *Tobacco II*, we summarized the correct legal standard in *Cohen* with respect to the commonality requirement under both the UCL and the CLRA: the UCL does not "authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice." (*Cohen v. DIRECTV, Inc., supra*, 178 Cal.App.4th at p. 980.) "[A]ctual reliance must be established for an award of damages under the CLRA." (*Ibid.*)

Thus, with respect to the unnecessary replacement theory of recovery asserted by plaintiffs, both the UCL and the CLRA require that plaintiffs show that the replacement of batteries without there being a need for such replacement, which is the alleged wrongful business practice asserted by plaintiffs, is common to the class.

Plaintiffs' reliance on the *Tobacco II* court's disapproval of *Collins* in dicta is unhelpful to their argument. As the *Tobacco II* court pointed out, "*Collins* involved the preliminary step of identifying the existence of an ascertainable class." (*Tobacco II, supra*, 46 Cal.4th at p. 323.) Here, the lower court determined that the class was ascertainable and that finding is not being challenged on appeal. Rather, the focus of this portion of the appeal is on the commonality requirement, which is separate and distinct from ascertainability.

With respect to plaintiffs' false advertising theory of recovery, both laws require, at a minimum, that the class be exposed to the allegedly false

advertising at issue and, with respect to the CLRA, an additional showing of reliance must be made. "In short, the trial court's concerns that the UCL and the CLRA claims alleged by [plaintiffs] would involve factual questions associated with their reliance on [Auto Club's] alleged false representations was a proper criterion for the court's consideration when examining 'commonality' in the context of [plaintiffs'] motion[s] for class certification, even after *Tobacco II*." (*Cohen v. DIRECTV, Inc., supra,* 178 Cal.App.4th at p. 981.)

██ With respect to the inference of reliance when a false representation involves a material fact, Reed's citation to *Steroid Hormone Product Cases, supra,* 181 Cal.App.4th 145, is not helpful to her case. Although the legal standard explained in *Steroid Hormone Product Cases* is correct, such analysis is premature here. An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class. (*Knapp, supra,* 195 Cal.App.4th at p. 945.)

b. *The Trial Court's Decision Is Supported by Substantial Evidence*

██ The record is replete with substantial evidence supporting the trial court's order. With respect to the unnecessary replacement theory of recovery, plaintiffs failed to meet their burden of showing that the unnecessary replacement of batteries was a common issue of fact. Two of the three named plaintiffs in the Davis-Miller appeal did not even allege that their batteries could still hold a charge. Only Keeler made such an allegation; however, despite stating that her husband "knew [the battery] was still good," there is no evidence in the record showing that the battery was reliable and could actually start a car. Similarly, although Reed alleged that her boyfriend informed her that her old battery was recharged, there is no evidence in the record showing that the battery was reliable or had been used to start a car.

With respect to the false advertising theory of recovery, the roadside battery assistance program was minimally advertised during the proposed class period in Westways Magazine, MemberSaver guides, renewal mailers and on Auto Club's Web site. Further, sales invoices delivered to customers after their purchase inconsistently referred to the member discount and free installation. Of the named plaintiffs who stated they saw either an advertisement or an invoice, none stated such information played a role in the decision to purchase a battery from Auto Club. Finally, of the declarations admitted into evidence, the majority of declarants (1) had never seen an ad for the roadside battery assistance program; (2) had never heard of the program prior to calling Auto Club for service; and (3) stated that either the ICS technician

did not mention any member discount or they do not recall the ICS technician's mentioning any member discount.

Therefore, we find that the trial court's order is supported by substantial evidence in the record and the trial court applied the proper legal criteria in addressing the class certification issue. Because the trial court stated at least one valid reason for denying the motion, we will affirm its order. (*Cohen v. DIRECTV, Inc., supra*, 178 Cal.App.4th at p. 981.)[10]

## *DISPOSITION*

The order denying class certification is affirmed. Auto Club shall recover its costs on appeal from plaintiffs in each of these consolidated cases.

Klein, P. J., and Kitching, J., concurred.

On November 22, 2011, the opinion was modified to read as printed above.

---

[10] Both the Davis-Miller plaintiffs and Reed argue on appeal that the trial court erred in finding that they did not have standing to pursue a claim under the UCL and the CLRA with respect to the adequacy requirement. "As we have already noted, we affirm the order denying class certification if any of the trial court's stated reasons are sufficient to justify the order. [Citations.]" (*Kaldenbach, supra*, 178 Cal.App.4th at p. 848, italics omitted.) Because we find that the trial court correctly analyzed the legal and factual issues pertinent to commonality with respect to both appeals, we need not reach or address the trial court's ruling with respect to standing for the same causes of action.