Filed 2/21/24 (unmodified opn. attached)

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MATEO BAKER, a Minor, etc., et al., | B320814 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. GC050404) |
| v. | |
| PACIFIC OAKS EDUCATION CORPORATION, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant. | **[No change in judgment]** |

The Court:

Plaintiffs' petition for rehearing, filed February 9, 2024, is hereby denied.

It is further ordered that the opinion filed herein on January 25, 2024, is modified as follows:

On page 30 of the opinion, first full paragraph, delete the first sentence:

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion section.

On appeal, plaintiffs do not challenge the trial court's conclusion that the services Pacific Oaks provided in the infant/toddler program fall outside the regulatory definition of care and supervision.

Replace the deleted portion with the following:

Plaintiffs contend a program description in Pacific Oaks's handbook and testimony from McComas and Rosenberg showed Pacific Oaks offered "care and supervision" to children in the infant/toddler program. The evidence does not support this conclusion. Neither the language in the handbook regarding the program's attention to "child/child interactions," nor the administrators' testimony about children playing with their parents onsite or staff members enrolling their children in Pacific Oaks programs, undermined the trial court's conclusion that the infant/toddler program did not provide "care and supervision" as the regulation defined the term.

On page 30 of the opinion, first full paragraph, the word "Instead" and the following comma are deleted and a new paragraph break is inserted. "Plaintiffs" is capitalized and the word "also" is inserted between the words "Plaintiffs" and "argue."

On page 42, at the end of first full paragraph, a footnote is inserted with the following language:

On appeal, Plaintiffs contend the handwritten portions of the sign-in sheets were admissible because Rosenberg admitted the truth of the hearsay statements when she testified that school personnel "could refer to the sign-in sheets" to conduct a head count. However, plaintiffs did not assert this argument in the trial court. They are precluded from arguing a new theory of

2

admissibility for the first time on appeal.  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282–283.)

All subsequent footnotes are renumbered accordingly.

There is no change in judgment.

LAVIN, Acting P. J.       EGERTON, J.       ADAMS, J.

Filed 1/25/24 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MATTEO BAKER, a Minor, etc., et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> PACIFIC OAKS EDUCATION CORPORATION, <br><br>     Defendant and Appellant. | B320814 <br><br> (Los Angeles County Super. Ct. No. GC050404) |

APPEAL from an order of the Superior Court of Los Angeles County, Maren E. Nelson, Judge. Affirmed.

Shenoi Koes, Allan A. Shenoi, Daniel J. Koes, and Benjamin Caryan, for Plaintiffs and Appellants.

Alston & Bird, Terance A. Gonsalves and Jesse Steinbach, for Defendant and Appellant.

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion section.

———————————————

Plaintiffs, as individuals and on behalf of a class of parents, sued Defendant Pacific Oaks Children's School (Pacific Oaks or the school), alleging the school failed to comply with child care facility licensing requirements.[1]  Pacific Oaks's license set a capacity limit of 77 children in the school's preschool programs. Plaintiffs allege Pacific Oaks enrolled more children than the license allowed, violating section 101161, subdivision (a) of title 22 of the California Code of Regulations.[2]  Although plaintiffs asserted class claims under the False Advertising Law (Bus. & Prof. Code, § 17500 et seq.), multiple prongs of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and for common law fraud, a bench trial proceeded only on the class UCL claim based on alleged unlawful conduct.

The trial court rejected plaintiffs' argument that enrollment numbers exceeding the capacity limit in the license established a violation of section 101161, subdivision (a). Instead, the court concluded plaintiffs could prove a violation only by showing more than 77 children were in attendance at the school at any one time during the class period.  Plaintiffs challenge this ruling on appeal, as well as several pre-trial rulings, orders regarding class certification, evidentiary rulings

_____

[1]  The named plaintiffs are Matteo Baker, a minor child, by and through his guardian ad litem Mark Baker; Leo Valadez, a minor child, by and through his guardian ad litem Sharal Churchill; Mark Baker; Yesika Baker; the Estate of Sharal Churchill; and Karen Keen (collectively plaintiffs).

[2]  All further undesignated regulatory references are to title 22 of the California Code of Regulations.

2

during trial, and the court's other substantive rulings on questions of law.

In the published portion of this opinion, we conclude that under the circumstances of this case, attendance, not enrollment, was the correct measure of "capacity." In the remainder of the opinion, we affirm the trial court's challenged orders regarding the class definition, discovery, standing, and the court's evidentiary rulings.

### FACTUAL AND PROCEDURAL BACKGROUND

Pacific Oaks provides early childhood education to children and families at a campus in Pasadena. The school's programs include "part-time classes in the morning or afternoon as well as full day childcare programs for families working outside their home." Part-time programs take place during morning or afternoon intervals in different yards on school grounds.

### DSS License and Plaintiffs' Original Complaint

In March 1996, the Department of Social Services (DSS) issued a license to "Pacific Oaks College & Children's Programs to operate and maintain a Day Care Center" (the DSS license).[3] The license provided: "Licensee prefers to serve children 2-5, M-F 8:00 – 6:00 p.m. Limitations in capacity per fire clearance are as follows: Boat Class– 16, Bamboo Class– 15, La Loma– 26,

---

[3]     Health and Safety Code section 1596.81, subdivision (a) authorizes the DSS to issue rules or regulations necessary to carry out the California Child Day Care Facilities Act. (Health & Saf. Code, § 1596.70 et seq.)  The DSS, through its Community Care Licensing Division (CCLD), is also responsible for issuing licenses to day care and other child care facilities, monitoring compliance, and administering corrective action for violations of licensing laws and regulations. (See Health & Saf. Code, § 1596.816.)

Peppers– 23." The license set a "total capacity" of 77. DSS also issued a license permitting "Pacific Oaks College & Children's Programs to operate and maintain a school-age [day care] center," with a total capacity of 24. At some point, Pacific Oaks requested that DSS cancel the license for the school-age day care program, stating that the program had "not been in use for 10 years plus." It is not clear from the record if DSS canceled the license.

In October 2012, Matteo Baker sued Pacific Oaks; the then Executive Director, Jane Rosenberg; and an individual teacher. The complaint alleged that due to the defendants' negligence and failure to properly supervise Matteo, he wandered alone into a playground and suffered a "near-death" incident that left him with severe and ongoing psychological injuries. The complaint asserted causes of action for negligence and statutory and regulatory violations.

In July 2013, Pacific Oaks applied to increase the preschool programs' capacity under the DSS license to 140. DSS denied the application, indicating Pacific Oaks failed "to provide satisfactory evidence that [it could] meet or conform to licensing requirements."[4] DSS stated Pacific Oaks had "demonstrated the inability to comply with statutes and/or regulations, as evidenced on visits dated 08/2/11, 8/18/11, 5/23/13, and 6/7/13" and listed

---

[4] DSS cited the following regulations in its letter: section 101229, subdivision (a)(1); section 101223, subdivision (a)(2); section 101212, subdivision (a)(1)(B); and section 101206, subdivision (a)(1)(e). The first two provisions concern supervision and "personal rights," and do not mention capacity. Neither the current Code of Regulations, nor the code in effect in 2013, appears to include a section 101212, subdivision (a)(1)(B) or section 101206, subdivision (a)(1)(e).

4

"some of the regulatory issues and statutes which were not complied with" as "conduct inimical," "reporting requirements," "neglect lack of care and supervision," and "personal rights." The denial letter concluded Pacific Oaks could "only operate with the capacity of 77 preschool age children that [was] noted on [its] current license."

In August 2013, Pacific Oaks's then Executive Director, Jayanti Tambe, wrote an e-mail informing parents that in May 2013, "the Children's School administration was notified by the Department of Social Services Community Care Licensing Division (CCLD) that our license did not reflect the actual number of students on campus. An application to request an increase in the license to accommodate our total planned student population was submitted for review." The message further notified parents that because DSS had denied Pacific Oaks's application, the school would "not be able to provide a space for [their] child(ren)" for the 2013–2014 school year. The record does not indicate which families received the e-mail.

In October 2013, Pacific Oaks again applied to increase the preschool programs' license capacity to 140. DSS granted the application in April 2014.

**The Class Action Claims**

In August 2014, plaintiffs filed the operative second amended complaint, adding two causes of action that were asserted on behalf of a putative class. Plaintiffs alleged Pacific Oaks was, among other things, "not properly licensed for the number of children it had accepted or would accept, but . . . was operating at overcapacity and in violation of its existing license," and the school had knowingly concealed this information from plaintiffs and class members. Plaintiffs also claimed Pacific Oaks

5

falsely advertised that it had " 'state-of-the-art' " play yards and facilities.

The first cause of action asserted a common law fraud claim, alleging that had class members known Pacific Oaks was operating in violation of the DSS license, with facilities that were not truly "state-of-the-art," they would not have selected Pacific Oaks or paid tuition. The second cause of action asserted claims of unfair competition and false advertising under Business and Professions Code sections 17200 and 17500. The complaint alleged that "[b]ut for the unfair competition and false advertising alleged . . . Plaintiffs and the members of the Class would not have paid tuition to Pacific Oaks because there were numerous comparable, alternative, tuition-free child care centers or public schools that were actually operating within capacity of their licenses, and providing students with a safe environment that were available" at the time plaintiffs' and class members' children attended Pacific Oaks. Plaintiffs requested class certification, damages, and restitution. In November 2014, the trial court stayed the individual negligence claims.

In June 2018, the trial court certified a "class consisting of parents and guardians of students who attended Pacific Oaks School and paid tuition during the period January 1, 2007 through August 31, 2013, to proceed as to the UCL and [false advertising law] claims premised on illegal or fraudulent conduct only." The court denied certification of plaintiffs' common law fraud class claim, finding each class member's actual reliance would require an individualized inquiry and individualized proof.

In December 2019, the trial court partially granted Pacific Oaks's motion to decertify the class. The court decertified the false advertising law claim and the UCL claim based on a fraud

by misrepresentation theory.  The court allowed the class UCL claims based on fraud by omission and unlawful conduct to proceed.  However, the court found the class definition was overbroad because it included parents and guardians of children who were enrolled in Pacific Oaks programs the DSS license did not cover, including Pacific Oaks's Infant/Toddler/Parent program (infant/toddler program) and the School Age Child Care program (school age program).  The court redefined the class, limiting it to " '[p]arents and guardians of former Pacific Oaks[ ] students who paid tuition from January 1, 2007 through August 2013 and whose students were enrolled in any "Pre-School Program" offered by Pacific Oaks during that time period.' "

In February 2020, the parties filed motions for summary adjudication.  Plaintiffs sought summary adjudication of the UCL class claims for unlawful and fraudulent conduct.  They argued the record established Pacific Oaks violated the DSS license capacity limit because it was undisputed that the school enrolled more than 77 students each year during the class period.

The court denied plaintiffs' motion in September 2020.  The court found the regulations governing child care facilities did not support plaintiffs' theory that Pacific Oaks's aggregate annual *enrollment* of more than 77 children violated the DSS license capacity limit.  The court rejected plaintiffs' argument that the term "capacity," as used in the regulations, meant the number of children enrolled at the facility.  The court further concluded plaintiffs' proposed definition of capacity was inconsistent with the plain language of section 101179, subdivision (a), which defines capacity as "the maximum number of children that can be cared for at any given time."  The court reasoned that whether capacity was exceeded "depend[ed] upon the *time* of

7

measurement," which was "consistent with Pacific Oaks' operations," including "different programs which different students attend at different times."

The trial court granted summary adjudication of plaintiffs' individual and class UCL claims based on fraud by omission and the false advertising law claims.[5] The sole remaining class claim was the UCL cause of action based on alleged unlawful conduct. The court bifurcated trial to allow the UCL class claim to proceed first to a February 2021 bench trial.

Plaintiffs had not indicated during discovery or the litigation of pre-trial motions that they would seek to offer evidence of Pacific Oaks's daily attendance to prove their case. However, prior to the start of trial, and in light of the trial court's ruling that enrollment numbers would not establish a violation of the DSS license, plaintiffs sought to obtain Pacific Oaks's records of daily attendance or "daily enrollment" by serving a notice to attend trial and bring documents on Pacific Oaks's custodian of records. Litigation ensued over the notice to attend and related motions to compel and quash. Eventually, on the first day of trial, the trial court ordered Pacific Oaks to produce "current rosters" and daily attendance records.

---

[5] Plaintiffs filed a petition for writ of mandate in this court challenging the trial court's order denying summary adjudication in their favor. (*Baker et al. v. Superior Court of Los Angeles County et al.* (Oct. 15, 2020, B307819).) We denied the petition.

***Trial of the Class Claim***[6]

At trial, plaintiffs offered the testimony of several witnesses, including two former Pacific Oaks executive directors. Jane Rosenberg was Pacific Oaks's Executive Director from 1999 to 2013. Rosenberg was not involved in the application process for the DSS license. She testified that DSS did not suspend or revoke Pacific Oaks's license for any reason during the class period. She also testified that it "was never the case" that every child in the school was in attendance every day. She explained, "You never have a hundred percent of your students in attendance on a given day. It just doesn't happen." Rosenberg indicated Pacific Oaks did not have a separate license for the infant/toddler program "because there was an adult accompanying every child the entire time the child was in the program."

Rosenberg testified that "the only way you would know for certain on a given day at a given time how many children are there would be to refer to the sign-in sheets. Parents were required to sign their children in, when they dropped them off to school each morning, and sign them out at the end of the day when they picked them up. [¶] So if you looked at a sign-in sheet

---

[6] The trial was conducted remotely. The court heard witness testimony over four days in February 2021. After the parties conditionally rested, the trial court set a schedule for further briefing on the admissibility of documentary evidence and submission of the parties' closing briefs. In April 2021, the trial court ruled on the admissibility of the challenged documentary evidence. In August 2021, the court held a further hearing on evidentiary issues and the parties gave their closing arguments. In November 2021, the trial court issued a proposed statement of decision and, in April 2022, a final statement of decision.

for a particular day, you would know exactly how many children were on campus at a given time." According to Rosenberg, no one at Pacific Oaks checked the sheets to see how many children were present at a time "because we handle that by making sure that the way we scheduled the programs, that they would only have a certain amount of children, that we could limit the children on the campus by the way we scheduled the various programs." Teachers gave the completed sign-in and sign-out sheets (sign-in sheets) to Rosenberg's administrative assistant at the end of every month. Pacific Oaks "always had attendance records" available to calculate the number of students on campus.

DSS conducted unannounced site visits at Pacific Oaks to ensure the facilities were safe for children. Rosenberg testified DSS made one such visit in May 2013, in response to a complaint. During the visits, DSS conducted "a census count of how many children were present on the campus at that time" and wrote the results in a "facility evaluation report." Six DSS facility evaluation reports from visits occurring during the class period were admitted into evidence. Each report listed a census count below the licensed capacity of 77. Rosenberg denied that Pacific Oaks ever provided care to more children than the DSS license allowed during her tenure.

The testimony of Pat McComas, the Executive Director of Pacific Oaks from March 2014 to July 2016, was more contradictory. Plaintiffs offered McComas's statements from an earlier deposition and declarations Pacific Oaks submitted in support of pre-trial motions. When asked at her deposition whether it was her understanding that when Pacific Oaks applied to increase its capacity from 77 to 140, it "was aware that it needed to make that change to have its existing operation

10

comply with DSS requirements," McComas answered, "I would assume so, yes." However, when describing the license capacity limit at her deposition, McComas testified, "the 77 means at one time. So that was the facility's limit. But there could be additional children there in the afternoon." When plaintiffs' counsel asked McComas about aggregate enrollment numbers, McComas testified the numbers "would include our infant/toddler program, which is not included in our licensing." She also testified some students were "counted twice" in the aggregate number because "[t]here's a morning program and there's also an afternoon program called [School Age Child Care] . . . for an after-school care program." Yet, she appeared to concede that in August 2013, Pacific Oaks was operating "in excess of its capacity."

In a 2016 declaration, McComas attested, "While it is true the school was (unintentionally) operating in excess of its capacity, there is no evidence that student safety and well-being was impacted." However, in a 2020 declaration, McComas attested that the statement in her 2016 declaration about overcapacity was based on plaintiffs' counsel's instruction during her deposition that "overcapacity" meant more students enrolled than stated on the school's license and made no distinction between students enrolled and students in attendance. McComas testified at trial that she was not sure if she "was referring to enrollment or attendance" in her 2016 declaration, but that between her deposition and her 2016 declaration nothing had changed her own understanding that "capacity" meant "at any one time."

At trial, McComas testified that during her deposition, "it was not at all clear that we ha[d] an agreed-upon definition of

11

what we were using about capacity.  [¶] I said what I thought. You [Plaintiffs' counsel] said what you thought, but we did not have a stated, shared, agreed-upon definition.  [¶] Sorry.  So it was confusing to me, honestly."  She indicated she did not review any attendance records before her deposition and had not been asked to do so.  She also reaffirmed statements from her 2020 declaration that plaintiffs' counsel did not ask her about attendance on any given day during her deposition.

McComas admitted she did not become Executive Director until 2014 and therefore had no personal knowledge of what had occurred at Pacific Oaks between 2007 and 2013.  However, according to McComas, DSS did not require Pacific Oaks to meet any conditions before it approved the increase in capacity in April 2014.

Plaintiffs asked the court to admit sign-in sheets Pacific Oaks had located for the 2009–2013 school years.  Following briefing on the admissibility of the documents, the trial court found "the sign-in sheets admissible as party admissions as to the number of children expected in each program on the date specified on the sign in sheets.  The signatures and sign in/out times are not admissible."  The court ordered Pacific Oaks to produce the records within five days of the order.[7]

In June 2021, plaintiffs submitted their closing trial brief, which included a declaration from plaintiffs' counsel, Allan A.

---

[7]    Pacific Oaks gathered the sign-in sheets in response to the notice to attend trial and bring documents.  The custodian of records testified at trial.  However, because the trial was conducted remotely, plaintiffs did not have physical access to the documents at trial.  Pacific Oaks further argued plaintiffs were not entitled to a copy of the records until the court admitted them into evidence.

Shenoi (Shenoi Declaration). Shenoi attested that exhibits A and B to the declaration "offer[ed] a general compilation of [the] 6,510" sign-in sheets Pacific Oaks produced. The compilations consisted of charts noting the number of students listed on each sign-in sheet by hour for each Pacific Oaks preschool program. Pacific Oaks moved to exclude the Shenoi Declaration. In August 2021, the court granted Pacific Oaks's motion, finding: 1) the declaration was hearsay without exception, and therefore not admissible under the secondary evidence rule; 2) Shenoi was acting as an advocate-witness through the declaration, in violation of the rules of professional conduct; and 3) the declaration was untimely offered after the close of evidence.

### Statement of Decision

In April 2022, following the issuance of a proposed statement of decision and submission of the parties' objections, the trial court issued its final statement of decision. The court found plaintiffs failed to prove their UCL class claim.

The court rejected plaintiffs' objection to the exclusion of the infant/toddler program and the school age program from the class and denied plaintiffs' request for reinstatement of the prior class definition. The court reasoned that redefining the class after trial would violate absent class members' procedural and substantive due process rights. The court further concluded neither excluded program was subject to the same licensing requirements as the preschool programs.

In their closing brief, plaintiffs asked the court to draw a negative inference against Pacific Oaks based on its failure to produce rosters kept pursuant to Health and Safety Code

section 1596.841.[8]  The court denied the request.  Although Pacific Oaks had not produced the rosters, the court concluded no adverse inference was appropriate since, as defined by statute, the rosters would not contain "the kind of information that would assist Plaintiffs in establishing their claims."

The trial court again rejected plaintiffs' argument that capacity was synonymous with enrollment.  Instead, the court concluded, as it had in ruling on plaintiffs' motion for summary adjudication, that capacity "speaks to the number of children that may attend at a given time."  The statement of decision then addressed each aspect of plaintiffs' evidence and concluded they failed to establish their "children (or any others) attended a particular program which was at overcapacity when the children were in that particular program."

The court noted McComas's deposition testimony defined capacity by the number of children present at the facility " 'at one time.' "  It also found credible McComas's trial testimony that she and plaintiffs' counsel did not have a common understanding of the term "capacity" during her deposition.  It afforded little weight to McComas's statement in her 2016 declaration that the school was operating over the capacity limit.  The court reasoned McComas had no personal knowledge of events at Pacific Oaks before she became Executive Director in 2014 and she did not

---

[8]     Health and Safety Code section 1596.841 requires a child day care facility to "maintain a current roster of children who are provided care in the facility.  The roster shall include the name, address, and daytime telephone number of the child's parent or guardian, and the name and telephone number of the child's physician."

14

review any attendance records before attesting the school was overcapacity.

The trial court also concluded plaintiffs did not establish that Rosenberg had knowledge of any capacity violation during her tenure. The court found Tambe's August 2013 e-mail was admissible as "an admission by Pacific Oaks as to what parents were told," but excluded as inadmissible hearsay the e-mail's statement that DSS told "an unidentified member" of the administration about the licensing issue. The trial court noted that "[a]lthough Tambe appeared on Plaintiffs' witness list, she was not called by Plaintiffs at trial nor was any deposition testimony from her provided. Likewise, no witness from DSS was called. Although DSS's records were subpoenaed there is no indication that DSS cited Pacific Oaks for a violation of its capacity license, sought to revoke its license, referred it to either civil or criminal authorities, or imposed any civil penalty upon it."

As for the sign-in sheets, the court reiterated that plaintiffs' summaries attached to the Shenoi Declaration were "based on a methodology that is not set forth in the record and [on] testimony that was excluded." The court noted the sign-in sheets for the 2009–2010 school year appeared to indicate that over 77 children were expected to attend the morning programs during that year. The court indicated this permitted an inference that more students may have attended than the license allowed in the 2009 to 2010 morning preschool programs. Yet, the court concluded that even if that inference were drawn, the evidence did not show plaintiffs "had any cognizable injury, as they did not attend Pacific Oaks in 2009–2010."

The trial court reasoned that without evidence that plaintiffs' children attended Pacific Oaks at a time when the DSS

15

license was violated, plaintiffs could not establish standing under Business and Professions Code section 17204. Further, as to absent class members whose children were enrolled in the morning program in the 2009–2010 school year, there was no showing as to what those class members would have done had they known of any capacity violation. The court further noted plaintiffs had not established the alleged capacity violation impaired student safety, or that the children received anything other than the education Pacific Oaks had promised, thus the requested remedy of a full tuition refund would not be equitable.

The court deferred entry of judgment in favor of Pacific Oaks until after plaintiffs' individual claims were tried. Plaintiffs timely appealed from the court's order.[9]

## DISCUSSION

**I. The Trial Court Correctly Concluded that "Capacity" Under the DSS License Limited the Number of Children Permitted to be Present at Any One Time, Not Aggregate Enrollment**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) "An unlawful business practice under section 17200 is ' "an act or practice, committed pursuant to business activity, that is at the

---

[9] The trial court's findings and order in favor of Pacific Oaks is a final determination of the merits of plaintiffs' UCL class claim for unlawful conduct and it terminated all class action litigation. (*Estate of Lock* (1981) 122 Cal.App.3d 892, 896 [a memorandum of decision is an appealable order when its "substance or effect" is a final determination on the merits].) The order is therefore appealable under the death knell exception to the one final judgment rule. (Cf. *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377, 1386, fn. 2.)

same time forbidden by law.  [Citation.]" ' [Citation.]" (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 287.)  "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the [UCL] makes independently actionable."  (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

Plaintiffs sought to establish that Pacific Oaks engaged in unlawful conduct by operating in violation of the capacity limit set forth in the DSS license.  They rely on section 101161, subdivision (a), which provides: "A licensee shall not operate a child care center beyond the conditions and limitations specified on the license, including the capacity limitation."

During the class period, Pacific Oaks's DSS license capacity limitation was 77 children.  Throughout the litigation, plaintiffs argued the aggregate enrollment data for the class period demonstrated that Pacific Oaks enrolled more than 77 children in each of the years at issue.  Plaintiffs contend the term "capacity limitation" in section 101161, subdivision (a), refers to enrolled children, irrespective of how many children might be physically present at the facility at any particular time.

The trial court rejected plaintiffs' interpretation of the regulation and the term "capacity."  The court concluded aggregate enrollment data would not establish that Pacific Oaks violated the capacity limitation.  Instead, the court found plaintiffs were required to show Pacific Oaks had over 77 children in attendance, not merely enrolled, to prove the school violated the DSS license.

On appeal, plaintiffs continue to argue that enrollment numbers exceeding the DSS license capacity limit were sufficient

17

to establish Pacific Oaks operated in violation of the license. Neither the plain language of the relevant regulations nor any other legal authorities support their argument.

### A.    Standard of review

" ' "The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law." ' " (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1234 (*Manriquez*).)  We review questions of law de novo.

When no reported California decision or administrative interpretation of a regulation exists, courts "interpret the regulation in accordance with applicable rules of statutory construction." (*Manriquez*, *supra*, 105 Cal.App.4th at p. 1235; *Butts v. Board of Trustees of California State University* (2014) 225 Cal.App.4th 825, 835 (*Butts*).)  "We give the regulatory language its plain, commonsense meaning.  If possible, we must accord meaning to every word and phrase in the regulation, and we must read regulations as a whole so that all of the parts are given effect." (*Butts*, at p. 835.)  "When the agency's intent cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part.  [Citation.] Whenever possible, we will interpret the regulation to make it workable and reasonable." (*Manriquez*, at p. 1235.)

### B.    The meaning of capacity

We begin our analysis with the plain text of the regulations.  As noted above, section 101161, subdivision (a), prohibits a licensee from operating a child care center beyond the conditions specified in the license, including the "capacity limitation."  Section 101152, subdivision (c)(2), defines

18

" 'capacity' " as "the maximum number of children authorized to be provided care and supervision at any one time in any licensed child care center."  Section 101179, subdivision (a) similarly provides that "[a] license shall be issued for a specific capacity, which shall be the maximum number of children that can be cared for at any given time."

Both section 101152, subdivision (c)(2) and section 101179, subdivision (a), use phrases indicating "capacity" includes a temporal element, and both refer to the maximum number of children a child care center can provide care for at once.  A child care center can only provide care and supervision to children who are physically present at the center's facility.  The phrase "at any one time," in its ordinary usage, means at a given moment in time, as does "at any given time."  Under the plain language of the regulation, "capacity" is an upper limit on the number of children who may be physically present at a child care facility while under the facility's care and supervision.

Here, the parties disputed whether determining if Pacific Oaks exceeded "the maximum number of children that can be cared for at any given time" was properly measured by the number of children enrolled at the school, or by the number of children actually in attendance at any one time.  Plaintiffs argue the only relevant number is the number of children who were enrolled, irrespective of how many children were actually attending—physically present—at the school.  Yet, at least in this case, the enrollment numbers did not represent the number of children simultaneously present, or expected to be present, and under Pacific Oaks's care and supervision.  Pacific Oaks's total "enrollment" therefore does not align with the regulations' definition of "capacity."  The trial court properly rejected

19

plaintiffs' argument as inconsistent with the plain language of the relevant regulations. Plaintiffs' interpretation is also inconsistent with other regulatory provisions and with the legislative purpose and intent of the authorizing statute.

For example, section 101179 instructs DSS to determine "capacity" by considering several factors, including the fire clearance; the licensee's ability to comply with applicable laws and regulations; the physical features of the center, including available space; and the number of available staff. (§ 101179, subd. (b)(1)–(4).) The regulatory focus on the physical features of a child care facility indicates "capacity" functions as an upper limit on the number of children the facility can physically accommodate at a time. When, as in this case, all enrolled children are not expected to be present at the same time at the facility, aggregate enrollment numbers do not assist in determining whether the facility has sufficient physical space, or whether it can maintain required teacher-student ratios.

Measuring capacity by counting the children in attendance is also consistent with the statute authorizing the regulations, the California Child Day Care Facilities Act. (Health & Saf. Code, § 1596.70 et seq.) The express legislative intent of the statute includes ensuring "a quality childcare environment" and the well-being of children of working parents by regulating the quality of child care facilities. (Health & Saf. Code, § 1596.72, subds. (b), (e), (f).) The Legislature also found "California has a tremendous shortage of regulated childcare, and only a small fraction of families who need childcare have it." (*Id*., subd. (f).) Yet, plaintiffs' interpretation of the regulations would restrict, rather than expand, the amount of potentially available child care. For example, using plaintiffs' analysis, if a facility with a

20

capacity limitation of 20 provides care to one group of 15 children in the morning, and another group of 15 children in the afternoon, with no overlapping times when all 30 children are present, the facility would still violate its license by having a total enrollment of 30 children. This interpretation of "capacity" would be inimical to the statute's purpose of promoting "the development and expansion of regulated childcare." (Health & Saf. Code, § 1596.73, subd. (f).)

We acknowledge that under some circumstances, enrollment numbers and attendance numbers might be functionally the same, or similar enough that enrollment numbers could provide circumstantial evidence or an inference of the number of children actually in attendance at any one time. In this case, however, the evidence established that the enrollment numbers in question were not a reliable proxy for how many children were physically present at Pacific Oaks at any given time. The enrollment numbers plaintiffs sought to rely upon were aggregate numbers that did not take into account the timing of different programs. The evidence affirmatively established that all enrolled children were not on campus at the same time. Instead, in any given class, some children attended only in the morning, some only in the afternoon, some all day. The enrollment numbers plaintiffs relied upon did not reflect these differences in attendance. Those numbers alone were therefore insufficient to establish a violation of the DSS license capacity limit.

Plaintiffs' citations to statutes and regulations defining "capacity" based on enrollment do not undermine this conclusion. Plaintiffs contend that if the phrase "at any one time" in section 101152, subdivision (c)(2) refers to children in attendance,

the term "enrollment" in Health and Safety Code sections 1596.807 and 1596.862 would have to be replaced with "attendance." We fail to see the connection between section 101152, a regulation that uses neither the term attendance nor the term enrollment, and entirely unrelated provisions of the Health and Safety Code. Plaintiffs offer no reasoning to explain their contention.[10] Similarly, Health and Safety Code section 1596.803 lists application fees for the issuance of a child day care facility license and sets forth a graduated fee schedule that increases based on the capacity of the center. Nothing about the provision "anchors capacity to enrollment," because otherwise "the annual fee would fluctuate day to day, and hour to hour," as plaintiffs claim. The regulations define capacity as the maximum number of children allowed at a facility. That an application fee is based on that maximum allowable number does not indicate "capacity" means the number of children allowed to enroll in the aggregate, rather than the number of children allowed to attend at any given time.

Plaintiffs have provided no legal authority that supports their argument. Their reliance on *Scott v. Phoenix Schools, Inc.*

---

[10] Health and Safety Code section 1596.807 concerns DSS's ability to allow an extended daycare program to serve additional children at a school site, so long as the additional children are "currently enrolled in a school," and the number of additional children "does not exceed 15 percent of the total enrollment in the extended daycare program. In no case shall the enrollment of the extended daycare program exceed the enrollment during the regular schoolday." Plaintiffs also refer to Health and Safety Code section 1596.862, which concerns written requests for "enrollment or retention of a nonminor student at a schoolage child care center."

(2009) 175 Cal.App.4th 702 (*Scott*), is unavailing.  In *Scott*, a former preschool director sued her employer for wrongful termination in violation of public policy after she informed the parents of a prospective student that the school did not have space for their child.  (*Id*. at p. 705.)  The plaintiff "asserted she was terminated for refusing to violate California Code of Regulations, title 22, section 101216.3," which establishes teacher-child ratios at child care centers.[11]  (*Id*. at p. 709.)  After a jury found in the plaintiff's favor, the school appealed.

The Court of Appeal found substantial evidence supported the conclusion that enrolling the child would have violated the regulation.  (*Scott*, *supra*, 175 Cal.App.4th at p. 709.)  In its analysis, the court summarized data in class rosters that reflected the number of students "scheduled to attend" the particular classroom in which the parents sought to enroll their child.  (*Id*. at p. 710.)  The number fluctuated, sometimes requiring two qualified teachers under the regulation, and sometimes requiring a teacher and an aide.  (*Ibid*.)  The court noted that if the prospective parents sought to enroll their child on certain specific days of the week, "the attendance of the . . . child would have violated the staffing ratios."  (*Ibid*.)  Although the evidence was inconclusive regarding both the days the prospective parents wanted their child to attend and the number of teachers or aides available to staff the classroom in which the child would be enrolled, the court concluded it was reasonable to infer enrolling the child would lead to a violation of the

---

[11]    Section 101216.3, subdivision (a) requires "a ratio of one teacher visually observing and supervising no more than 12 children in attendance," except as otherwise provided in the regulation.

23

regulation based on witness testimony that "the class was already operating at times in violation of the staffing ratios, and that the school was short-staffed . . . ." (*Id*. at p. 711.)

Thus, the *Scott* court's analysis of a potential violation was not based on enrollment alone, but instead a combination of enrollment numbers and evidence showing when enrolled students were "scheduled to attend." (*Scott*, *supra*, 175 Cal.App.4th at p. 710.) That combined evidence indicated that on some days, enough enrolled children were scheduled to attend that adding one more child would cause the school to violate the teacher-child ratios the regulation required. (*Ibid*.) In this analysis, the court used attendance as a touchstone, as it was the *attendance* of the child, once enrolled, that would have led to a violation.

Plaintiffs ignore the role of attendance in *Scott* and instead focus on the court's rejection of the employer's argument that "it had no notice that enrolling too many children could lead to liability because the regulation is tied to attendance rather than enrollment." (*Scott*, *supra*, 175 Cal.App.4th at p. 714.) The court reasoned the employer "could legitimately assume that if the [parents] enrolled their daughter, they intended for her to attend." (*Id*. at pp. 714–715.) Therefore, "if the school forced its employees to enroll more children than the school could legitimately accept because of staffing requirements, that may be seen as requiring the employees to violate the regulation." (*Id*. at p. 715.)

Plaintiffs urge us to read this portion of *Scott* as establishing a rule that under the child care center licensing regulations, enrollment is the equivalent of attendance in determining capacity. As an initial matter, we note that *Scott* did

24

not concern capacity or sections 101152, subdivision (c)(2); 101161, subdivision (a); or 101179, subdivision (a). The alleged violation of teacher-child ratios—the basis for the *Scott* plaintiff's wrongful termination claim—is not at issue in this case. That difference aside, however, the *Scott* court's discussion of enrollment and attendance is inapplicable for more fundamental reasons. The *Scott* court considered enrollment on a single classroom level, and the use of that specific enrollment data as an indication of attendance. This was reasonable, in part, because the evidence established that at least on some days, the number of enrolled children scheduled to attend would require two teachers, rather than the teacher and aide who were assigned to the classroom on those days. Given the number of personnel available, the facility could reliably assume that adding one more child would prevent it from complying with teacher-child ratios on those days in particular. Further, on some days, all enrolled children were scheduled to attend.

In contrast, here plaintiffs argued only that the aggregate annual enrollment numbers established a capacity violation, irrespective of actual anticipated attendance, which varied based on the classroom, the time of day, and the day of the week. There was no evidence that all enrolled children were ever expected to be under Pacific Oaks's care and supervision at the campus at the same time. Rather than offering admissible evidence of enrollment numbers that could reasonably approximate the relevant attendance of children as in *Scott*, plaintiffs merely argued capacity under the license and enrollment were one and

the same.[12]  The *Scott* court's reasoning using enrollment as a measure of expected attendance is therefore not applicable in this case.

*Los Angeles International Charter High School v. Los Angeles Unified School District* (2012) 209 Cal.App.4th 1348 (*Charter*), which plaintiffs also cite, is even less relevant.  *Charter* concerned a school district's compliance with regulations in title 5 of the California Code of Regulations governing charter schools.  The court found the enrollment data for one campus was sufficient to show the district properly considered "capacity" under a regulation requiring it to determine whether public school facilities could accommodate charter students.  (*Id*. at p. 1359.)  Whether enrollment or attendance was the appropriate measure of capacity was not at issue, nor is there any reasoning or analysis to suggest any holding in the case would be persuasive in analyzing compliance with a child care center license.  Cases are not authority for propositions not considered.  (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.)

We thus reject plaintiffs' strained and unsupported interpretation of section 101161, subdivision (a).  Section 101179, subdivision (a) and section 101152, subdivision (c)(2) offer an unambiguous definition of capacity that can only be reasonably understood as setting an upper limit on the number of children who may physically be present at a center's premises at one time, and therefore under the facility's care and supervision.  That number is reflected in attendance.  While in some cases the same

---

[12]     To the extent plaintiffs eventually pivoted and argued a narrower set of enrollment numbers would establish a violation, they failed to provide admissible evidence to support their claim, as discussed more fully below.

number may be equivalent to enrollment, that was not the case here. The enrollment data plaintiffs relied upon did not reflect attendance, or, in other words, did not reflect the number of children physically present at Pacific Oaks at any given time. Plaintiffs never proffered admissible evidence of enrollment similar to the evidence at issue in *Scott*. The trial court properly concluded plaintiffs could not prove a violation of section 101161, subdivision (a) using Pacific Oaks's annual aggregate enrollment data alone.

[[Begin nonpublished portion.]]

## II. The Trial Court Did Not Abuse Its Discretion in Defining the Class

In the remainder of their arguments on appeal, plaintiffs contend the trial court's rulings improperly limited their claims and prevented them from establishing that, even using attendance to measure capacity, Pacific Oaks violated the DSS license. We find no error in the trial court's rulings.[13]

Plaintiffs contend the trial court erred by redefining the class in December 2019. They also ask this court to restore the original class definition, which included parents and guardians whose children attended the infant/toddler program and the school age program.

Trial courts may redefine a class "to reduce or eliminate" a manageability problem "created by a potentially overbroad class definition." (*Sarun v. Dignity Health* (2019) 41 Cal.App.5th 1119,

---

[13] Because we affirm the trial court order, we need not address Pacific Oaks's cross-appeal. We deny Pacific Oaks's motion to augment the record as moot.

27

1137–1138 & fn. 18.)  "The trial court's rulings regarding . . . the necessity of modifying an existing class certification are reviewed on appeal for abuse of discretion." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 80.)

### A.    Infant/toddler and school age programs

### 1.    Background

In addition to programs for preschool age children, Pacific Oaks at times operated a program for infants and toddlers and their parents, and a program for school age children.  A Pacific Oaks handbook described the infant/toddler program as an opportunity for the adult parent, guardian, or caregiver to attend "two hours of play and developmental learning" with their child. The program allowed parents and caregivers to "begin the process of separation" while remaining "close at hand" and "readily available to their children" during the program.

The school age program offered morning and afternoon care to children enrolled at Pacific Oaks, or other private or public schools in the area, and provided full day child care on school holidays and throughout summer.  Pacific Oaks had a separate license for school age children that contained its own capacity limitation.  However, Tambe's undated letter informed DSS that the school age program had "not been in use for 10 years plus."[14] When asked about the letter at her deposition, McComas testified that "the school did not have school age children as stated."

In December 2019, the court redefined the class to "Parents and guardians of former Pacific Oaks' students who paid tuition from January 1, 2007 through August 2013 and whose students

---

[14]    Although there was no date on the letter, it was signed by Tambe as Executive Director, a post she held from June 2013 to March 2014.

were enrolled in any 'Pre-School Program' offered by Pacific Oaks during that time period." This removed from the class parents and guardians whose children were enrolled in Pacific Oaks's infant/toddler and school age programs. The court concluded the day care licensing regulations did not apply to the infant/toddler program since parents and guardians attended with their children. The court further determined the school age program was covered by a different license and, in any event, was exempt from day care licensing requirements under Health and Safety Code section 1596.792, subdivision (h).

### 2. Discussion

Plaintiffs contend the trial court's ruling was incorrect because the DSS license limiting capacity to 77 applied to all of Pacific Oaks's child care programs without exception. We disagree.

Regarding the infant/toddler program, section 101152, subdivision (c)(7) defines "Child Care Center" or "Day Care Center" as any child care facility in which non-medical care and supervision are provided to children in a group setting. The regulations define "care and supervision" as any one of several activities "provided by a person or child care center to meet the needs of children in care."[15] (§ 101152, subd. (c)(3).) The

---

[15] These activities include: "(A) Assistance in diapering, toileting, dressing, grooming, bathing, and other personal hygiene. [¶] (B) Assistance with taking medications as specified in Sections 101226(e)(3) and (e)(4). [¶] (C) Storing and/or distribution of medications as specified in Section 101226(e). [¶] (D) Arrangement of and assistance with medical and dental care. [¶] (E) Maintenance of rules for the protection of children. [¶] (F) Supervision of children's schedules and activities for the

29

evidence before the court indicated parents participated in the infant/toddler program with their children and were present at all times.  This supported the trial court's conclusion that the children in the infant/toddler program were not under Pacific Oaks's "care and supervision."

On appeal, plaintiffs do not challenge the trial court's conclusion that the services Pacific Oaks provided in the infant/toddler program fall outside the regulatory definition of care and supervision.  Instead, plaintiffs argue that since Health and Safety Code section 1596.750 defines "[c]hild day care facility" as a facility providing care to "children under 18 years of age," Pacific Oaks's DSS license had to cover all children on the Pacific Oaks campus, regardless of the program.

Plaintiffs' reliance on this provision is misplaced.  Health and Safety Code section 1596.750 merely defines the term "[c]hild day care facility" as "a facility that provides nonmedical care to children under 18 years of age in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual on a less than a 24-hour basis."  This definition supports, rather than undermines, the trial court's conclusion that the infant/toddler program was not providing the kind of "care" that necessitated a child day care facility license.  The trial court could reasonably conclude based on the evidence before it that children in the infant/toddler program were not "in need of personal services, supervision, or assistance essential for sustaining the activities of

---

protection of children.  [¶] (G) Monitoring food intake or special diets.  [¶] (H) Providing basic services as defined in Section 101152.b.(1)."  (§ 101152, subd. (c)(3).)

daily living" or "protection," because they attended only with their parents or caregivers, who remained present at all times.

Further, Health and Safety Code section 1596.750 does not refer to licenses, let alone establish the scope of licenses, that DSS issues to child day care facilities. Plaintiffs fail to address the more detailed licensing regulations defining child care centers, which the Health and Safety Code expressly authorizes DSS to promulgate. (Health and Saf. Code, § 1596.81 [DSS "shall adopt, amend, or repeal . . . any rules or regulations which may be necessary to carry out this act"].) Plaintiffs do not explain or support with authority their implicit contention that Health and Safety Code section 1596.750 displaces these more specific definitions. In addition, the evidence in this case indicated DSS issued separate licenses for different programs. There was no basis for the trial court to conclude the DSS license, which specifically referred to preschool age children, nonetheless covered all children at Pacific Oaks, for any reason, or of any age.

With respect to the school age program, it is undisputed that Pacific Oaks had a separate license for school age children that contained its own capacity limitation. Plaintiffs argue the program was covered by the day care center license after Tambe requested that DSS cancel the school age program's license. The evidence, in plaintiffs' view, shows the school age program's *license* was not in use during the class period. However, the evidence plaintiffs cite does not support their argument. The extent of any school age program during the class period was unclear. For example, Tambe's undated letter informed DSS that the "school age *program*"—not the school age *license*, as plaintiffs state in their brief—had "not been in use for 10 years plus." When asked about the letter at her deposition, McComas testified

31

"the school did not have school age children as stated." Even assuming Pacific Oaks operated a school age program during some portion of the class period, there is no evidence establishing DSS in fact cancelled the license during the class period in response to Tambe's request. As stated above, plaintiffs did not call Tambe or a DSS official to testify at trial.

The trial court also found the school age program did not need a child care facility license pursuant to Health and Safety Code section 1596.792, subdivision (h), which exempts "[e]xtended daycare programs operated by public or private schools" from licensing requirements. Plaintiffs contend this provision does not apply because the license identified the licensee as "Pacific Oaks College and Children's Programs," even though the licensed *facility* was identified as "Pacific Oaks Children's School." They offer no other argument to explain their contention that Pacific Oaks is not a private school under the statute.

Plaintiffs fail to provide any discussion of the extended day care exception under Health and Safety Code section 1596.792. They further provide no support for the proposition that the name of the licensee on the license determines whether the exemption applies, irrespective of the nature of the facility. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)

Plaintiffs fail to show that the trial court's redefinition of the class was unsupported by substantial evidence, relied on improper criteria, or rested on erroneous legal assumptions. (*Moen v. Regents of University of California* (2018) 25

Cal.App.5th 845, 853.) We cannot find the trial court abused its discretion in narrowing the class definition to apply only to parents and guardians whose children were enrolled in a Pacific Oaks preschool program during the relevant class period.[16]

## III. The Trial Court's Discovery Rulings Were Proper

### A. December 2019 discovery order

#### 1. Background

During pre-trial discovery, plaintiffs did not attempt to procure documents or information reflecting Pacific Oaks's daily or hourly anticipated attendance numbers. After the close of discovery, Pacific Oaks argued in its motion for decertification that "a trier of fact would need to delve into which children attended which program on which days and whether the total attendance for that given day exceeded the school capacity." At the hearing on the decertification motion, plaintiffs maintained that under their theory of liability, "it [was] irrelevant, as a matter of law, that some portion of Defendant's children's school may, at some periods of time . . . or on some particular time or date, may have had attendance within the licensed capacity."

Nonetheless, plaintiffs subsequently served additional discovery requesting Pacific Oaks's daily attendance records. The trial court found the requests were untimely as they were served after the discovery cut-off. Plaintiffs then filed a motion for leave to serve additional discovery seeking, in part, "all records, if any, maintained by Pacific Oaks of daily capacity of students during the Class Period." Plaintiffs asserted the request was justified

---

[16]    We need not address plaintiffs' additional argument that the trial court erred in finding the school age program was also exempt under Health and Safety Code section 1596.792, subdivision (k).

33

because Pacific Oaks changed its position about whether it violated the license during the class period and was now claiming that "on some days it did not violate the 77 capacity-license."

Plaintiffs, however, continued to maintain that enrollment numbers alone determined whether Pacific Oaks had violated the DSS license. At the December 2019 hearing on the motion for leave to serve additional discovery, the court observed plaintiffs' request for records of Pacific Oaks's daily capacity "seems to be made only because Pacific Oaks argued in support of the decertification that the data was relevant to damages questions." The trial court gave a tentative ruling that if Pacific Oaks intended "at trial to introduce evidence of the days in which it contends it didn't exceed its license capacity, including any summaries, it seems to me that data sufficient to verify the accuracy of the summary should be produced so as to expedite the trial proceedings."

Pacific Oaks's counsel stated it did not "intend to rely on any additional records beyond what's already in evidence right now at trial, which is the DSS records that indicate on certain days the school was already within its capacity." Pacific Oaks's counsel further confirmed those records had already been produced. Despite lengthy discussions between the court and counsel about other aspects of the court's tentative ruling, plaintiffs did not object to or comment on the tentative discovery order. After the hearing, the trial court issued a written order consistent with the tentative ruling that required Pacific Oaks to produce any responsive data at least 30 days before trial.

### 2. Discussion

Plaintiffs now contend the trial court's December 2019 discovery order "violated established law that discovery is broad"

34

and "misapplied the burden of proof."[17]  We find no error.

A trial court has "broad discretion in controlling the course of discovery and in making the various decisions necessitated by discovery proceedings." (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431.)  "The trial judge's application of discretion in discovery matters is presumed correct, and the complaining party must show how and why the court's action constitutes an abuse of discretion in light of the particular circumstances involved." (*Id*. at p. 432.)

Throughout the litigation, plaintiffs elected to advance only one theory of liability for their UCL claim: Pacific Oaks violated child care licensing regulations by *enrolling* students in excess of its licensed capacity.  At the time of the trial court's December 2019 order, plaintiffs continued to argue that theory only, asserting attendance was "irrelevant" to their theory of the case.  They did not disagree with the trial court's assessment that the discovery was necessary only to respond to or evaluate arguments Pacific Oaks might make at trial.  Indeed, even after the court's December 2019 ruling, plaintiffs continued to maintain attendance was not relevant to their theory of liability.  (*Seahaus La Jolla Owners Assn. v. Superior Court* (2014) 224 Cal.App.4th 754, 767 [the "proper purpose[ ] of discovery" is to obtain relevant information].)  The trial court did not abuse its discretion in limiting the December 2019 order to information sufficient to

---

[17]    Plaintiffs vaguely refer to the trial court's misapplication of an unidentified "criminal law standard," without citation to authority, in their reply brief.  To the extent plaintiffs are raising a different argument for the first time in their reply brief, without citation to legal authority, the argument is forfeited.

verify the accuracy of any arguments or evidence Pacific Oaks intended to offer at trial.

## B. Enrollment records, attendance records, and current rosters

Plaintiffs also challenge the trial court's February 2021 order denying their motion to compel Pacific Oaks to produce enrollment records in response to their notice to the custodian of records to attend trial and bring documents. The court found the request for enrollment records was improper because it was "in the nature of a discovery device, [did] not specify a specific document and [was] not a proper use of a notice to appear at trial." Plaintiffs do not identify any alleged trial court error with respect to that finding, except to assert that the trial court "misapplied the law in construing enrollment as irrelevant." This assertion ignores the trial court's actual ruling.

Similarly, in a single sentence, plaintiffs challenge the trial court's denial of plaintiffs' request for an adverse inference because Pacific Oaks produced only incomplete attendance records. Plaintiffs offer no factual or legal support for this argument. "We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise." (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1831, fn. 4; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["We are not bound to develop appellants' arguments for them"].) We deem the argument forfeited.

Plaintiffs further argue the trial court was compelled to draw an adverse inference against Pacific Oaks because it failed to produce "current rosters." They rely on *Scott, supra,* 175 Cal.App.4th 702, for the proposition that rosters would reveal

enrollment information relevant to the licensing regulations. Plaintiffs' argument incorrectly equates the rosters in *Scott* with plaintiffs' specific request, which was for rosters under Health and Safety Code section 1596.841. Health and Safety Code section 1596.841 does not require that rosters show which programs children are enrolled in or the hours of the day they attend. (Health & Saf. Code, § 1596.841 [roster shall include "the name, address, and daytime telephone number of the child's parent or guardian, and the name and telephone number of the child's physician"].) The trial court therefore reasonably declined to infer that the rosters would have established Pacific Oaks violated the DSS license. The court explained it "cannot infer that the rosters would contain information that the statute does not require." We find no abuse of discretion.

## IV. The Trial Court's Evidentiary Rulings and Determinations Were Proper

Plaintiffs contend the trial court erroneously excluded evidence and incorrectly discounted evidence they claim established Pacific Oaks violated the DSS license. We find no error.

### A. Sign-in sheets

The trial court admitted the printed portions of the sign-in sheets as party admissions "as to the number of children expected in each program on the date specified on the sign in sheets." However, the court ruled plaintiffs did not establish the signatures or handwritten times were subject to a hearsay exception, such that they could be offered to show "which children were dropped off and picked up on each day and at what time." Plaintiffs argue on appeal that the signatures and handwritten

37

times were admissible under the business records exception to the hearsay rule.

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto.' (Evid. Code, § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132; *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1483–1484.)

The sign-in sheets contained multiple hearsay statements. To introduce the sign-in sheets for the truth of the matter asserted—the specific times and specific days children were signed in and signed out of Pacific Oaks—plaintiffs were required to show that the sheets themselves, and the sign-in and sign-out times and signatures written by parents and caregivers, were each subject to a hearsay exception. (*Caliber Paving Co., Inc. v. Rexford Industrial Realty & Management, Inc.* (2020) 54 Cal.App.5th 175, 189 [double hearsay statement admissible only if each level of hearsay comes within an exception to hearsay rule].) Plaintiffs contend the handwritten portions of the sign-in sheets were admissible under the business records exception. We disagree.

Evidence Code section 1271 exempts writings from the hearsay rule if, among other things, "[t]he writing was made in

38

the regular course of a business" and "[t]he sources of information and method and time of preparation were such to indicate its trustworthiness." (*Id.*, subds. (a), (d).) " 'The chief foundation of the special reliability of business records is the requirement that they must be based upon the first-hand observation of someone whose job it is to know the facts recorded. . . . But if the evidence in the particular case discloses that the record was not based upon the report of an informant having the business duty to observe and report, then the record is not admissible under this exception, to show the truth of the matter reported to the recorder.' " (*MacLean v. City & County of San Francisco* (1957) 151 Cal.App.2d 133, 143, quoting McCormick on Evidence, p. 602, § 286.)

" 'Applying this standard, the cases have rejected a variety of business records on the ground that they were not based on the personal knowledge of the recorder or of someone with a business duty to report to the recorder.' " (*Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 191 (*Zanone*), quoting Cal. Law Revision Com. com., 29B pt. 4, West's Ann. Evid. Code (1995 ed.) foll. § 1271.) "To qualify as a business . . . record, a document must be created by an employee of the business . . . ." (*People v. Campos* (1995) 32 Cal.App.4th 304, 309.)

Here, parents or caregivers of each child signed the sheets and identified the times their children were signed into and out of Pacific Oaks's care. There was no evidence the parents and caregivers were acting in the course of Pacific Oaks's business, or their own, and they had no business duty to accurately observe and report their children's arrival and departure times to Pacific Oaks. (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 1002; *Zanone, supra,* 162 Cal.App.4th at pp. 191–192.) The times noted

39

on the records were not based on the observations of people "whose job it [was] to know the facts recorded." (*Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 126.)  The trial court did not abuse its discretion by finding the handwritten portions of the sign-in sheets did not qualify under the business records exception to the hearsay rule.

### B.    Shenoi Declaration and summaries

Plaintiffs also contend the trial court erred in excluding the exhibits attached to the declaration of plaintiffs' counsel (the Shenoi Declaration) that plaintiffs submitted with their closing brief.  In his declaration, Shenoi explained that plaintiffs had compiled Pacific Oaks's 6,510 sign-in sheets into summaries.  The summaries are two sets of charts attached as exhibits to the declaration.  The charts in exhibit A tally the number of students enrolled in each program on days during the class period for which attendance records were provided.  The count is based on the printed names on each sign-in sheet.  The charts in exhibit B tally the number of students in actual attendance "based on drop-off signatures on each sign-in sheet."

Shenoi declared that he "oversaw the preparation" of the summaries.  He explained that, first, "[d]ata entry was performed" on the sign-in sheets.  Sign-in sheets were excluded if they were duplicative, contained data for programs for which plaintiffs were not seeking restitution, or were incomplete.  The remaining 3,580 sign-in sheets related to programs held on 353 days during the class period.  Shenoi declared enrollment exceeded Pacific Oaks's capacity license on 352 of 353 days, excluding the infant/toddler and school age programs.  Further, Shenoi averred that attendance exceeded the capacity license on 343 of 353 days.  He indicated plaintiffs' analysis showed

40

enrollment and attendance exceeded capacity on five days when the "census counts" in DSS Facility Evaluation Reports were below the capacity limit.

Pacific Oaks moved to exclude the declaration and summaries, including on the ground that both were inadmissible hearsay. The court granted the motion, finding the Shenoi Declaration was "post-trial evidence on which Pacific Oaks did not have an opportunity to cross-examine," hearsay without exception, and a violation of the advocate-witness rule because it "place[d] counsel in the role of a witness on a disputed issue of fact." The court also found exhibit B inadmissible because it was based on signatures the court had excluded as inadmissible hearsay. We review the trial court's ruling for abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.)

Plaintiffs challenge only the trial court's exclusion of the summaries. We note, however, that plaintiffs offered the summaries only as exhibits to the Shenoi Declaration, which the trial court also excluded. On appeal, plaintiffs do not challenge the trial court's ruling that the declaration was hearsay not subject to an exception. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1354 ["It is well established . . . that declarations constitute hearsay and are inadmissible at trial . . . unless the parties stipulate to the admission of the declarations or fail to enter a hearsay objection"].) Because plaintiffs have failed to affirmatively demonstrate error with respect to the ruling excluding the declaration, we presume the trial court's decision was correct. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.)

Moreover, plaintiffs' arguments as to the summaries themselves lack merit. As explained above, the trial court

41

admitted portions of the sign-in sheets and excluded others. Exhibit B contained summaries of the sign-in sheets based on the handwritten notations the trial court found inadmissible. We have concluded the trial court did not abuse its discretion in excluding those notations and a summary of inadmissible evidence is itself inadmissible. Plaintiffs' reliance on the secondary evidence rule for a contrary result is misplaced. Evidence Code section 1521 " 'permits the introduction of "otherwise admissible secondary evidence" to prove the contents of a writing. It does not excuse the proponent from complying with other rules of evidence, most notably, the hearsay rule.' " (*Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 594.) The trial court did not abuse its discretion in excluding summaries that were based on inadmissible evidence.

The trial court also did not abuse its discretion in excluding exhibit A. Under Evidence Code section 1521, the content of a writing may be proved by otherwise admissible evidence, but the court must exclude secondary evidence if the court determines either "[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion," or "[a]dmission of the secondary evidence would be unfair." (*Id.*, subds. (a), (b).) The trial court could reasonably conclude both circumstances were present in this case.

Exhibit A was not simply a summary of previously admitted documents. Instead, according to the Shenoi Declaration, counsel "performed" data entry on the documents, made decisions about which documents would be excluded from the summaries "[c]onsistent with plaintiffs' [litigation] position," analyzed the records in connection with other documents to

decide what to include in the summaries, and made analytical decisions about which records were "useable." Counsel determined the methodology and described it only in a declaration, not in testimony subject to cross-examination. Pacific Oaks had access to the underlying documents but had no means to test or challenge the process by which plaintiffs prepared the summaries, or the accuracy or validity of the numerous decisions plaintiffs' counsel made in preparing the summaries. The trial court could reasonably conclude that under these circumstances, Evidence Code section 1521 required the exclusion of the summaries.

Plaintiffs argue that a summary of voluminous business records may be admissible. However, plaintiffs fail to acknowledge the full extent of the rule they indirectly reference, Evidence Code section 1523, which provides: "(a) Except as otherwise provided by statute, oral testimony is not admissible to prove the content of a writing. [¶] . . . [¶] (d) Oral testimony of the content of a writing is not made inadmissible by subdivision (a) if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

Plaintiffs did not offer "oral testimony" as a substitute for the voluminous records, and instead attempted to proffer a summary authenticated only by a hearsay declaration. (Cf. *Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d. 410, 418–419 [plaintiffs' summary of voluminous invoices admissible where plaintiffs' controller prepared the summary, defendant deposed plaintiffs' secretary-treasurer about the preparation of the summary, and underlying records were

43

admissible].)  Further, the summary of the records was not "the general result of the whole" (Evid. Code § 1523, subd. (d)), but rather excerpts curated solely by plaintiffs' counsel.  We find no abuse of discretion in the trial court's exclusion of either the Shenoi Declaration or the attached summaries.[18]

### C.    DSS statement in Tambe's 2013 e-mail

As described above, in August 2013, then Executive Director Tambe informed parents by e-mail that Pacific Oaks was notified in May 2013 "by the Department of Social Services Community Care Licensing Division (CCLD) that [Pacific Oaks's] license did not reflect the actual number of students on campus."  At trial, the court admitted the statement only "as an admission by Pacific Oaks as to what parents were told."  The court declined to admit the statement for its truth—that DSS said "the license did not reflect the actual number of children on campus"—finding it was inadmissible hearsay.

Plaintiffs contend the trial court erred in admitting the statement for a limited purpose and in rejecting their argument that the statement was admissible as an adoptive admission by Pacific Oaks that it violated its license.  Plaintiffs have forfeited this contention by failing to support it with any reasoned argument.  Aside from alleging the trial court erred and citing the Evidence Code regarding adoptive admissions, plaintiffs have provided no analysis.  This is insufficient.  "[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the

---

[18]    In light of this conclusion, we need not address plaintiffs' other arguments regarding the trial court's exclusion of the summaries.

44

record." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.)

Even were we to consider plaintiffs' argument, we would find it fails on the merits. Under Evidence Code section 1221, a statement offered against a party is not inadmissible hearsay if the party, "by words or other conduct," manifested his "adoption or his belief in [the statement's] truth." "The theory of adoptive admissions expressed in section 1221 ' "is that the hearsay declaration is in effect repeated by the party; his conduct is intended by him to express the same proposition as that stated by the declarant." ' [Citations.]" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 326.)

Plaintiffs identify no evidence showing Pacific Oaks's administrators, officers, or agents conceded the accuracy of DSS's statement that Pacific Oaks's license did not reflect the number of students on campus. To the extent any of McComas's testimony could be understood to have referred to the DSS statement in Tambe's e-mail, the court rejected the testimony because McComas lacked personal knowledge. Nor did Tambe's recitation of DSS's purported notification manifest Pacific Oaks's belief in the truth of DSS's conclusion. " '[T]he mere recital or description of another's statement does not necessarily constitute an adoption of it: "[A] statement describing another's declaration is normally not regarded as an admission of the fact asserted by the other. One does not admit everything he recounts or describes merely by reason of the relating of it." [Citation.]' Citation.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1258.)

Further, while Tambe's 2013 e-mail indicated the school would not be able to accommodate some children in the 2013–2014 school year because DSS denied its application to increase

45

capacity, there was no evidence the existing or planned student population was actually reduced, or that any admissions offers were rescinded. Indeed, McComas testified that DSS did not require Pacific Oaks to meet any conditions before it approved the increase in capacity in April 2014. Plaintiffs' counsel claimed in his closing argument that DSS required Pacific Oaks to expel "30 or more families" before increasing the capacity limit, but he conceded there was no evidence of this in the record. The trial court did not abuse its discretion in rejecting plaintiffs' argument that the DSS statement in Tambe's e-mail was admissible for its truth as an adoptive admission.

### D. Challenges to the trial court's resolution of contradictions in the evidence

#### 1. The trial court did not abuse its discretion when weighing documentary evidence

Plaintiffs assert the trial court improperly discredited a report from the Pasadena Fire Department and improperly credited DSS reports. We find no error.

During McComas's testimony, plaintiffs sought to admit a report from the Pasadena Fire Department. The report included a section for the fire department to note "item(s) which must be corrected in order to meet minimum fire and life safety requirements." In this section, the inspector noted, "177 students," with no further explanation or context. The trial court admitted the report but refused to "conclude from the document that anyone has counted 177 students on this date." The court noted plaintiffs did not call a witness from the fire department to testify as to how the document was prepared and declined to "deduce from the document on its face [that] 177 students were at the location in the particular programs that are at issue."

46

Plaintiffs do not argue this specific ruling was erroneous, but instead assert the fire department record was the "only count of actual attendance on [Pacific Oaks's] premises during the Class Period."[19] They contend, without further explanation, that the trial court erred in not accepting their interpretation of the report and in failing to rely on it. This contention does not state a cognizable legal argument on appeal as it ignores both the trial court's evidentiary ruling and its role as the trier of fact.

The challenged DSS records were Facility Evaluation Reports from six different days during the class period. The reports contain narratives that reflect they were completed by an official from DSS's Community Care Licensing Division after visits to Pacific Oaks's facility. Each report includes a "census" number. The trial court admitted these records under the public records exception to the hearsay rule and noted that as public records, they were "presumed to be accurate when prepared as part of [a public employee's] official duties." The court did not find the reports "definitively establish[ed] compliance" but considered them in concluding plaintiffs did not establish a violation of the DSS license.

On appeal, plaintiffs argue their summaries of the sign-in sheets established the DSS records did not count "peak attendance" on five of the six reported days. However, the trial court excluded the summaries. We have concluded that ruling

_____

[19] Plaintiffs' additional assertions about the fire department report rely on misleading and inaccurate characterizations of the reporter's transcript. Neither Rosenberg nor McComas testified that the fire department counted children to determine compliance with the DSS license, or attested to the accuracy of the fire department report as a record of the number of children present in the preschool programs.

was not an abuse of discretion.  Plaintiffs may not challenge the trial court's factual findings with evidence not admitted.

Moreover, it is within the province of the trial court to resolve conflicts in the evidence.  "[T]he trial court is the sole arbiter of all conflicts in the evidence . . . and, in the exercise of sound legal discretion, [the trial court] may draw or may refuse to draw inferences reasonably deducible from the evidence." (*California Teachers Assn. v. Governing Board* (1983) 144 Cal.App.3d 27, 37.)  Plaintiffs' disagreement with the trial court's resolution of conflicting evidence is not a basis for reversal.

## 2. The trial court did not err in weighing McComas's testimony

Plaintiffs argue the trial court erred by declining to accept as true McComas's deposition testimony and her 2016 declaration admission appearing to concede that Pacific Oaks violated the DSS license capacity limit.  We find no error.

It is the sole province of the trial court to weigh evidence and testimony, including the credibility of statements made in declarations.  (*DiRaffael v. California Army National Guard* (2019) 35 Cal.App.5th 692, 718; *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)  When, as here, "witnesses give conflicting factual accounts and the fact finder makes credibility assessments to resolve these conflicts, we defer to the fact finder's determinations." (*RMR Equipment Rental, Inc. v. Residential Fund 1347, LLC* (2021) 65 Cal.App.5th 383, 392 (*RMR*).)

McComas gave sworn statements about Pacific Oaks's compliance with the DSS license in her deposition, in two subsequent declarations, and at trial.  In its role as the trier of fact, the trial court assigned weight to McComas's various statements.  The trial court reasonably credited parts of

48

McComas's testimony and gave little weight to others. We will not disturb the trial court's determinations of McComas's credibility on appeal. (*RMR*, *supra*, 65 Cal.App.5th at p. 392.)

Plaintiffs argue McComas's testimony admitting Pacific Oaks's noncompliance with the DSS license constituted a binding admission on Pacific Oaks because McComas was its administrator and agent; she testified as the person most knowledgeable; and her statements qualified as party admissions. However, this argument conflates the admissibility of evidence with determinations of its weight. The code sections plaintiffs cite in their opening brief merely describe when certain party testimony is admissible; they do not establish the degree to which a factfinder must find the testimony probative or establish that the testimony must be accepted as true. (Code of Civ. Proc., § 2025.620, subd. (b) [a party's deposition testimony at trial is admissible when offered by an adverse party regardless of availability]; Evid. Code, §§ 1220, 1221 [party admissions and adoptive admissions are "*not made inadmissible* by the hearsay rule," italics added].) The trial court did not find McComas's testimony inadmissible. It assigned weight to her testimony based on its assessment of the facts in the record. Plaintiffs' arguments are therefore inapposite.

The case law plaintiffs cite does not aid their argument. In *Hejmadi v. AMFAC, Inc.* (1988) 202 Cal.App.3d 525, the court affirmed the summary adjudication of a defamation claim because the plaintiff conceded in a deposition and in opposition papers that the defendant's allegedly defamatory statement was true. (*Id.* at pp. 552–553, citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*).) *D'Amico* held a plaintiff's statements in a declaration do not create a triable issue

49

of fact if they contradict " 'a clear and unequivocal admission by the plaintiff' " in a deposition. (*D'Amico*, at p. 21.) The instant case is easily distinguishable. The trial court was not tasked with determining whether there was a triable issue of fact. Instead, the court was the trier of fact who was required to assess credibility, resolve evidentiary conflicts, and make factual findings. Further, McComas's statements were not "clear and unequivocal" such that they compelled the trial court to accept them as irrefutable admissions.

Indeed, the record does not support plaintiffs' claim that there was only one reasonable interpretation of McComas's testimony. Even in the select excerpts plaintiffs cite, McComas did not testify that the statements in her 2016 declaration were based on a specific definition of "capacity." We find no basis to disturb the court's resolution of McComas's contradictory testimony.[20]

## V. The Trial Court Correctly Found Plaintiffs Lacked Standing as to Their UCL Unlawful Conduct Claim

Plaintiffs contend the trial court erred by finding that even if the inference could be drawn from the sign-in sheets that Pacific Oaks had more children in attendance than the license

---

[20] Plaintiffs also contend the trial court disregarded undisputed evidence that Pacific Oaks administrators used "enrollment" interchangeably with "capacity." Rosenberg's testimony, which plaintiffs cite in support of this claim, does not reflect that she used the terms synonymously. Further, even if testimony demonstrated Pacific Oaks administrators used the term "enrollment" when discussing capacity limits, the proper interpretation of section 101161 and related regulations is a question of law. Lay witness testimony on that issue was not determinative.

allowed during the 2009–2010 school year, plaintiffs did not establish standing under the UCL. We again find no error.

In their objections to the statement of decision, plaintiffs identified one day in the 2009–2010 school year on which they claimed Pacific Oaks exceeded its capacity in the afternoon. However, the trial court noted plaintiffs' children's names were not listed on the attendance records for that day. In fact, the trial court found the evidence established plaintiffs' children did not attend Pacific Oaks until the 2010–2011 school year. Further, at a post-trial hearing, plaintiffs' counsel conceded plaintiffs never had proof, "and did not attempt to present" proof at trial, that plaintiffs' children attended a particular program while it was overcapacity. Plaintiffs' counsel further stated he had not examined the attendance records to determine whether more than 77 students attended Pacific Oaks on dates the named plaintiffs' children were present because "[t]hat is not the theory of [plaintiffs'] case." In its statement of decision, the trial court found plaintiffs lacked standing because they did not prove "that *Plaintiffs'* children attended at a time when the number of children in attendance, or expected to be in attendance, exceeded the capacity license."

Plaintiffs contend the trial court's standing determination was erroneous as a matter of law.[21] We review questions of law

_____

[21] Plaintiffs do not contend the evidence was insufficient to support the trial court's factual findings. Instead, for the first time on appeal, they cite evidence that a named plaintiff's child was present on the morning of November 15, 2011, when the number of children in attendance exceeded 77 according to signatures on the sign-in sheets. Not only did plaintiffs fail to make this argument in the trial court, it is also based on evidence

51

related to standing de novo and find no error.  (*San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73.)

Business and Professions Code section 17203 permits a private plaintiff to pursue "relief on behalf of others" under the UCL only if the plaintiff "meets the standing requirements of Section 17204 . . . ."  Business and Professions Code section 17204 authorizes "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition" to prosecute an action for relief.  (See *California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1082.)

"To satisfy the [UCL] standing requirements[,] . . . [the plaintiff] must . . . (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim."  (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322, italics omitted.)  Where economic injury is concerned, as here, "[t]he relevant inquiry for standing purposes is whether a defendant's unlawful conduct caused the plaintiff to part with money."  (*Mayron v. Google LLC* (2020) 54 Cal.App.5th 566, 575 (*Mayron*).)

---

the trial court found inadmissible, a ruling we have concluded was proper.  We therefore do not consider the argument.  We similarly disagree that the notation of "177 students" on the Pasadena Fire Department's report established standing.  We have found no abuse of discretion in the trial court's ruling that the fire department report's notation did not conclusively reflect the number of students present at Pacific Oaks in the preschool programs on the day the report was made.

"In order to pursue a UCL claim, the plaintiff must show that the practices that it characterizes as unlawful caused it to suffer an actual economic injury." (*Two Jinn, Inc. v. Government Payment Service, Inc.* (2015) 233 Cal.App.4th 1321, 1333.) Thus, standing for a UCL claim based on alleged unlawful conduct requires that the plaintiff show the unlawful conduct itself caused the economic injury plaintiffs claim they suffered. Plaintiffs cannot make that showing here based on unlawful conduct that occurred only when their children were not enrolled at Pacific Oaks. Plaintiffs appear to claim they have standing because they would not have enrolled their children had they known Pacific Oaks operated in violation of the DSS license in the school year *before* they began attending the school, even if they cannot establish a license violation in the years they actually attended. Yet this theory, even if valid, would only relate to claims in which the unlawful business practice was the failure to inform parents of the lack of compliance with the license. This was the allegation underpinning plaintiffs' fraud-based claims. It was insufficient as a basis for standing for the unlawful conduct claim pled and litigated by plaintiffs that Pacific Oaks only operated unlawfully by exceeding its capacity license in violation of state regulations. (*Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 11–12 [trial court erred by "fail[ing] to take into account the different prongs of the UCL"].)

As we understand plaintiffs' argument, they further contend a reference in *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 322 (*Tobacco II*), which expressed doubt about the validity of an appellate court decision in *Collins v. Safeway Stores* (1986) 187 Cal.App.3d 62 (*Collins*), *affirming* the trial court's denial of

class certification, stands for the proposition that plaintiffs may have standing under the UCL even when it is impossible to determine whether they actually purchased a defective product. Even if this reference was binding precedent, we would find it inapplicable here due to the disparate facts of this case.

In *Collins*, it was undisputed that contaminated eggs were sold to some consumers within a certain time period. (*Collins*, *supra*, 187 Cal.App.3d 62 at pp. 66–67.) The unknown was which particular consumers received contaminated eggs in their purchase. In contrast, here, the trial court did not find that there were violations of the DSS license during the entire class period. Instead, the court indicated there was an inference of a violation in the 2009–2010 school year, a year in which the trial court found plaintiffs' children were *not* attending. We further note that *Tobacco II*'s discussion of standing generally was in the context of fraud-based UCL claims alone. (*Tobacco II*, *supra*, 46 Cal.4th 298 at pp. 311–312 & fn. 7.) Plaintiffs fail to demonstrate that the trial court's ruling was incorrect under either *Collins* or *Tobacco II*.

Because plaintiffs did not present any evidence of a causal link between any underlying regulatory violation and the nature of their alleged loss, their payment of tuition did not establish standing under the UCL. (*Mayron*, *supra*, 54 Cal.App.5th at p. 576; *Demeter v. Taxi Computer Services, Inc.* (2018) 21 Cal.App.5th 903, 915 [plaintiff failed to show standing where he adduced no evidence that the defendant's "alleged failure to provide him with a written contract containing the terms required by" law caused him to purchase a membership].)

## VI.    Plaintiffs' Other Arguments

Plaintiffs make myriad arguments, some for the first time on appeal, that are insufficiently supported by the record and legal authority.  We deem such arguments forfeited and conclude we need not address others in light of our conclusions above.

### A.    Other alleged unlawful conduct under UCL

For the first time on appeal, plaintiffs argue Pacific Oaks's failure to regularly monitor daily attendance constituted an unlawful practice under the UCL.  Plaintiffs also contend that under Health and Safety Code section 1596.76, it was unlawful for Pacific Oaks to exclude children younger than two, or older than five, when determining whether the school was in compliance with the DSS license capacity limit.

Plaintiffs did not raise these theories of UCL liability below.  Consequently, the trial court had no opportunity to consider them, nor did Pacific Oaks have an opportunity to respond.  " '[A]ppealing parties must adhere to the theory (or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal . . . .' [Citation.]" (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997; *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1519 [" 'Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier' "].)  We will not consider on appeal plaintiffs' new theories of liability under the UCL.

**B. UCL claim based on fraud by misrepresentation and omission theories**

The trial court decertified plaintiffs' UCL claim based on a fraud by misrepresentation theory. The court also granted summary adjudication of plaintiffs' UCL claim based on a fraud by omission theory. Plaintiffs do not identify any error in the trial court's decertification order, or the summary adjudication order, with respect to these claims. Instead, plaintiffs cursorily argue the trial court's ruling should be reversed because parents "were likely to be deceived by [Pacific Oaks's] business practices," even if not "illegal *per se*." Plaintiffs do not identify the trial court's purported errors, explain how their claim satisfies class requirements or how the facts raised a triable issue, or otherwise support their position with reasoned argument or citation to authority. We deem these arguments forfeited. (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.)

**C. Common law fraud claims**

Our conclusion that enrollment numbers alone could not demonstrate a violation of the DSS license fatally undermines plaintiffs' argument that the trial court erred in denying class certification of the common law fraud claim. Plaintiffs appear to assert that even if they failed to show Pacific Oaks engaged in any illegal activity, the school's undefined "practices unquestionably impacted the safety of children," thus unidentified "material omission[s]" presented common questions of law and fact as to reliance. We disagree. The trial court denied class certification on the ground that whether any omission was material would require individualized inquiries. After evaluating the evidence and the parties' arguments, the court concluded the evidence was insufficient to conclude class-

56

wide reliance could be presumed by the materiality of the alleged omission. (*In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 133.) The court's reasoning was proper based on the evidence before it, and is further bolstered by the subsequent determination, which we affirm, that plaintiffs have been unable to show a violation of the DSS license based on enrollment numbers, and any potential violation could not be characterized simply as Pacific Oaks enrolled more children than the DSS license allowed. Plaintiffs have failed to show the trial court abused its discretion in denying class certification as to the common law fraud claim.

### D.     Restitution arguments

Finally, plaintiffs assert the trial court committed numerous reversible errors in rejecting plaintiffs' claims for restitution. We need not address these arguments. Restitution was not at issue unless plaintiffs established entitlement to relief. We have affirmed the trial court's ruling that plaintiffs did not make that threshold showing.

[[End nonpublished portion.]]

**DISPOSITION**

The trial court's order is affirmed.  Pacific Oaks to recover its costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**

ADAMS, J.

We concur:

LAVIN, Acting P. J.

EGERTON, J.

58